THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

DOUGLAS H. HARDY, M.D.,

GLENN CHAMPION, ESQ.                              CASE NO.24-cv-12102

DYLAN TENT, ET AL, As Representatives of a        HON. Jonathan J.C. Grey

Class of Real Estate Brokers and Agents,          MAG.  David D. Grand

PLAINTIFFS,

V.                                                          CLASS ACTION

NATIONAL ASSOCIATION OF REALTORS,

MICHIGAN ASSOCIATION OF REALTORS,

THE GROSSE POINTE BOARD OF REALTORS,

GREATER METROPOLITAN ASSOCIATION OF

REALTORS, NORTH OAKLAND COUNTY BOARD

OF REALTORS, AND REALCOMP II,

DEFENDANTS.

---

**PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUHTORITIES.................................................................iii

ISSUES PRESENTED......................................................................v

CONTROLLING OR MOST APPROPRIATE AUTHORITY.......................vi

I.      INTRODUCTION.............................................................1

II.     STATEMENT OF FACTS..............................................…....3

III.    STANDARD OF REVIEW............................................…...7

IV.    ARGUMENT..................................................................8

    A. PLAINTIFFS' FIRST AMENDED COMPLAINT SETS FORTH PLAUSIBLE

       ANTITRUST CLAIMS...................................................8

       1.  Section 1 of the Sherman Antitrust Act.............................9

       2.  Section 2 of the Sherman Antitrust Act.............................17

       3.  The Michigan Antitrust Act.........................................18

    B. PLAINTIFFS' FIRST AMENDED COMPLAINT SETS FORTH A PLAUSIBLE

       CLAIM FOR CONSPIRACY ...........................................19

V.     CONCLUSION.............................................................20

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Case Law:**                                                                      Page:

*Bell Atlantic Corp. v. Twombley*, 500 U.S. 544; 127 S. Ct. 1955; 167 L. Ed. 2d 929 (2007)................................................................ 7

*Bryant v. McDonough*, 72 F.4th 149 (6th Cir. 2023)............................... 7

*Campbell v. Wells Fargo Bank*, 781 F. 2d 440 (5th Cir. 1986)................... 7

*Data Processing Service Orgs. v. Camp*, 397 U.S. 150; 90 S. Ct. 827; 25. L. Ed. 2d 185 (1970)................................................................... 10

*Eastman Kodak Co. v. Image Tech Services*, 504 U.S. 451; 112 S. Ct. 2072; 119 L. Ed. 2d 265 (1992)........................................................... 14

*Findling v. RealComp II LTD*, No. 17-cv-11255 (E.D. Mich. 3/22/2018)........................................................................ 15

*Graphic Products Distributors Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir. 1983)................................................................................... 12

*Hunter v. Caliber Systems Inc.* 220 F.3d 702 (6th Cir. 2000)................... 7

*Interstate Circuit v. United States*, 306 U.S. 208; 59 S. Ct. 467; 83 L. Ed. 610 (1939)............................................................................... 20

*Jefferson Parish Hospital District 2 v. Hyde*, 466 U.S. 2; 104 S. Ct. 1551;80 L. Ed. 2d 2 (1984)................................................................... 14

*Johnson v. BAC Home Loan Services*, 867 F. Supp. 2d 766 (E.D. N.C. 2011) 7

*Kaiser Aluminum v. Avondale Shipyards*, 677 F.2d 1045 (5th Cir. 1982)....... 7

*Keener v. Sizzler Family Steak Houses*, 597 F.2d 453 (5th Cir. 1979).......... 13

*Key Enterprises of Delaware v. Venice Hospital*, 919 F. 2d 1550 (11th Cir. 1990)................................................................................. 17,19

*Northern Pacific Railroad Co. v. United States*, 356 U.S. 1; 78 S. Ct. 514; 21 L.Ed.2d 545 (1958)................................................................ 14

*Southaven Land Company, Inc. v. Malone Hyde Inc.*, 415 F.2d 1079 (6th Cir. 1983)............................................................................ 18

*Thompson v. Metropolitan Multi List*, 934 F.2d 1566 (11th Cir. 1991)......... 9,15

*Todorov v. DCH Health Care Authority*, 921 F.2d 1438 (11th Cir. 1991)........ 11

*Total Benefits Plan v. Anthem BCBS, Inc.*, 552 F.3rd 430 (6th Cir. 2008)....... 7

*U.S. Steel v. Fortner Enterprises*, 429 U.S. 610; 97 S. Ct. 861; 51 L. Ed. 80 (1977)................................................................................. 14

*United States v. Grinnell*, 384 U.S. 563; 86 S. Ct.1698; 16 L. Ed. 2d 778 (1966)................................................................................. 17,20

*United States v. Realty Multi List, Inc.*, 629 F. 2d 1351 (5th Cir. 1980)......... 9

*Statutes:*

*Michigan Antitrust Reform Act MCL 445.771*................................ 18

*15 U.S.C. Section 1 (1973)*........................................................9

*15 U.S.C. Section 2 (1973)*..................................................... 17

*Court Rules:*

*FRCP 15 (B) (2)*..................................................................21

*Exhibits:*

*Exhibit 1. Correspondence with Defendants*

*Exhibit 2. Ledger of Interested Parties Nationally*

*Exhibit 3. Similar Federal Lawsuits*

*Exhibit 4. Phoenix Board of Realtors Action*

*Exhibit 5. NAR Gross Mismanagement*

*Exhibit 6. Plaintiffs' First Amended Complaint*

<u>**ISSUES PRESENTED**</u>

**Should this Court dismiss Plaintiffs Complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure?**

Specifically:

1. Have Plaintiffs adequately alleged sufficient facts to establish an anti-trust violation under either sections 1 or 2 of the Sherman Act or under the Michigan Antitrust Reform Act?

   Plaintiffs answer "Yes."

   Defendants answer "No."

2. Have Plaintiffs stated a claim for conspiracy among the Defendants?

   Plaintiffs answer "Yes."

   Defendants answer "No."

## MOST APPROPRIATE AND CONTROLLING AUTHORITY

*Eastman Kodak Co. v. Image Tech Services*, 504 U.S. 451; 112 S. Ct. 2072; 119 L. Ed. 2d 265 (1992)

*Kaiser Aluminum v. Avondale Shipyards*, 677 F.2d. 1045 (5th Cir. 1982)

*Keener v. Sizzler Family Steak Houses*, 597 F.2d 1560 (11th Cir. 1983)

*Key Enterprises of Delaware v. Venice Hospital*, 919 F. 2d. 1550 (11th Cir.   1990)

*Southaven Land Company, Inc. v. Malone Hyde Inc.*, 715 F.2d. 1079 (6th Cir. 1983)

*Thompson v. Metropolitan Multi List*, 934 F.2d. 1566 (11th Cir. 1991)

*Total Benefits Plan v. BCBS, Inc.*, 552 F.3rd. 430 (6th Cir. 2008)

*United States v. Grinnell*, 384 U.S. 563; 86 S. Ct.1698; 16 L. Ed. 2d 778 (1966)

*United States v. Realty Multi List, Inc.*, 629 F.2d 1351 (5th Cir. 1980)

# I.   __INTRODUCTION__

This action  challenges the requirement that all Realtors, Brokers and Agents in the State of Michigan be members of three associations, the National Association of Realtors, the Michigan Association of Realtors, and a local Board of Realtors such as The Grosse Pointe Board of Realtors, The Greater Metropolitan Association of Realtors and/or The North Oakland County Board of Realtors in order to access the Multiple Listing Service, known  as the "MLS". REALCOMP II is a software company that manages the MLS and regulates its use by brokers and agents. RealComp is owned and operated by the local boards of realty and contains information on real properties for sale which is vital to a broker or agents' ability to do business, and which is not available from any other source. The Plaintiffs challenge the compulsory membership in these associations to gain access to the MLS and the information it provides and allege that this pattern and practice of the Defendants constitutes a violation of the Antitrust laws, and creates an Unfair Restraint on Trade, a Monopoly and a Conspiracy.

While these alleged practices by Defendants have existed for years, the recent settlement by the NAR of a national class action lawsuit out of Missouri eliminated the requirement of a broker's compensation to be reflected on the MLS, essentially inviting brokers and agents to participate in deceptive compensation practices and greatly diminished any value these organizations have to individuals such as the Plaintiffs. Thus, this compulsory membership and the changes implemented and required by NAR as a result of the settlement, have rendered membership in these organizations of no benefit. Yet to successfully practice the sale of residential real estate and access the information compiled by the MLS and market real estate listings, nationally and in the State of Michigan, membership in these organizations is mandatory.

This required membership creates a restraint of trade to real estate brokers and agents

who do not wish to belong to these organizations as brokers and agents consider the use of the MLS to be a necessity to perform business transactions and make a living. Plaintiffs have standing to bring these claims as they have suffered an anti-trust injury, and they are an efficient enforcer of the antitrust laws. The real estate market in Michigan is the relevant market and the ability to use the MLS is a product which Plaintiffs seek to access. Defendants have tremendous market power as they tie membership in their organizations to accessing the information available on the MLS and have control over essential market data which gives them monopolistic power to dictate participation. While Defendants allege that Plaintiffs seek to challenge the mandatory requirement of membership to access the MLS but want to retain the full benefits membership provides, such an allegation is false. Plaintiffs only seek access to the MLS much in the same way the states of California, Georgia and Florida allow without any other requirements or obligations to the Defendant organizations.

This pattern and practice of mandatory membership also constitutes a monopoly in that brokers and agents are unable to fairly compete with other realtors who are members of these organizations as these organizations prohibit access to the information contained in the MLS and the ability to effectively market real estate listings without membership. Moreover, the information on the MLS is not available from any other source, making it virtually impossible for agents and brokers who do not elect to become members to successfully conduct business. Defendants also require members such as Plaintiffs to pay significant yearly membership fees to at least three (3) organizations for each broker and agent; these fees are required by the national board (NAR), the state board and the local boards. These mandatory memberships yield millions of dollars per year to each of the Defendants and impose a hardship on those agents and brokers who cannot afford these fees. Further, the State of Michigan requires all real estate agents to be

licensed and pay yearly dues to practice in the state. These fees plus the required fees charged by the Defendants make it even more difficult for brokers and agents to effectively do business.

The Defendants' practices are not limited to Michigan and in fact are present in most states where these requirements are similarly dictated by the NAR and the state and local boards. Defendants coerce Plaintiffs to belong to their organizations by wielding their market power and thereby force brokers and agents into membership and paying their requisite fees. This tying of membership to the MLS has a substantial effect on Interstate commerce. In Southeastern Michigan alone, there are over 16,000 members in Defendant organizations and over 35,000 members in the State of Michigan paying tens of millions of dollars annually to Defendants to access the MLS and market real estate listings.    Plaintiffs seek to challenge this compulsory membership and Defendants' policies as unlawful.

## II.   <u>STATEMENT OF FACTS</u>

Plaintiffs are real estate brokers and agents located in Southeastern Michigan. Plaintiff, Douglas Hardy MD, owns and operates Signature Sotheby's International Realty and is also a licensed Broker. Plaintiff, Glenn Champion, is the head broker at Sotheby's and a licensed attorney in the state of Michigan. Plaintiff, Dylan Tent, is a licensed real estate agent who is affiliated with Sotheby's. The National Association of Realtors is an organization out of Chicago, Illinois which regulates brokers and agents nationally by its membership requirements. The Michigan Association of Realtors is a similar organization and essentially an extension of the NAR in the state of Michigan. The local boards of reality operate in conjunction with and at the direction of the national and state boards to control brokers and agents, their sales practices and their commissions.

The Defendants jointly and uniformly require membership in each of their organizations to access information maintained on the MLS, the Multi-Listing Service. The MLS contains information which is critical to a broker or agent's ability to list, market and sell residential real estate, primarily because it contains information which is not available from any other source. It also allows brokers and agents to market their listings to all other realtors. The defendant organizations own and operate the MLS and control access to the information contained on it. Up until recently, the NAR's rules required all agents and brokers to be members of their organization in order to be deemed a REALTOR. The NAR Constitution and Bylaws require this three-way membership.  However, after several other lawsuits challenging this requirement as an antitrust violation were filed, they shifted the responsibility of enforcing mandatory membership in all three boards, national, state and local, to state and local boards. Now, in order to access the MLS, state and local boards of realty require all brokers and agents to be a member of the NAR, the state board and at least one local board. So, even though the NAR claims they no longer "require" membership, in reality they do as enforced and mandated through the state and local boards. Each of these entities charge fees to the brokers and agents yielding tens of millions of dollars to them annually. In addition, the access Defendants "allow" through their mandatory membership requirements is more than just viewing information but also includes the ability to market real estate listings to all other realtors which is crucial to brokers' and agents' ability to do business. These facts are essentially undisputed by the Defendants and are set forth in detail in Plaintiffs' FAC.

The NAR was recently sued in another class action lawsuit in Missouri. As a part of that settlement, the NAR agreed to remove the requirement that brokers' commissions be listed on the MLS and instead set new rules which required that Sellers negotiate the commissions for the sale

of their homes independently with the broker and buyer.  The Plaintiffs, and many other brokers and agents across the country, found this decision by the NAR to be intolerable as it opened the door for backroom dealing, secret commission arrangements and potential discrimination against potential buyers based upon race, national origin and other factors. While Plaintiffs had for years been challenging the Defendants' mandatory membership requirements, this settlement and the resulting changes in the way brokers and agents handled commissions was the proverbial straw that broke the camel's back.  To be clear, this action is not challenging the settlement in the Missouri Class Action as Defendants suggest. Rather, it is one more factor which Plaintiffs reviewed in light of evaluating the Defendants' conduct and actions in mandating membership in their organizations and is provided for background purposes only.

Plaintiffs thereafter contacted the NAR, The Michigan Association of Realtors and each of the local boards named as defendants requesting that they be allowed to opt out of membership. In each instance, Plaintiffs were told they could not opt out of membership as membership was **mandatory**.[1] Plaintiffs attempted to resolve the matter with each of the Defendants individually prior to filing litigation, but Defendants refused to alter their position, and this action commenced.

Plaintiffs challenge the mandatory membership requirements imposed by the Defendants in these organizations to access the information on the MLS.  Plaintiffs allege this mandatory requirement and the tying of membership to the information on the MLS creates an antitrust violation, creates a monopoly and Defendants uniform practices in this regard constitute a conspiracy. In support of these allegations, numerous other brokers in Michigan and from around the country have reached out to the Plaintiffs objecting to the identical policies and mandates which

---

[1] Copies of this correspondence are attached as Exhibit 1.

are being raised in this action, and expressing the same dissatisfaction with the NAR and their state and local boards which also require the same mandatory membership.[2]  Further, while this action was the first to be filed in the country, several other identical lawsuits have been filed in other states illustrating a unified opposition to the NAR practices and those state and local organizations linked to the NAR.[3]

Several states such as Georgia, Florida, California and most recently Arizona have taken action to stop the NAR and the state organizations from wrongfully mandating membership. These states allow a broker or agent to access the MLS without compulsory membership in the NAR and the state boards.  In order to illustrate the lengths to which the NAR has gone to tie membership in these organizations to the MLS, and the active stance they have taken to enforce this policy, on December 19, 2024, the NAR sent a cease-and-desist letter to the Phoenix Board of Realtors after that board unanimously agreed to allow MLS access to brokers and agents who were not members of the NAR, or any state or local boards. The Phoenix Board of Realtors voted to allow access to the MLS for a fee without requiring membership in these boards. The NAR immediately retaliated by threatening to sue the Phoenix Board of Realtors seeking to prohibit local boards from making this change and subsequently threatened the Phoenix Board of Realtors with significant sanctions if they did not change course and go back to mandating membership in order to access the MLS.[4] The NAR has now sued the Phoenix Board of Realtors and moved to revoke their charter.

In addition, the NAR has been the subject of much scrutiny over the last 12 months as several investigations into the practices of the NAR have yielded multiple examples of gross

---

[2] A ledger reflecting these contacts is attached as Exhibit 2.
[3] Federal lawsuits on this issue are pending in Michigan, Pennsylvania, Texas and Louisianna. See attached Exhibit 3.
[4] See attached Exhibit 4 which verifies these NAR actions.

financial mismanagement, sexual misconduct by its leadership and other improprieties.[5] These developments have furthered Plaintiffs' dissatisfaction with the Boards and the required membership requirements.

By bringing this action, Plaintiffs seek to have the same option as is being afforded those brokers and agents in Georgia, California, Florida and Arizona.

### III.   STANDARD OF REVIEW

A motion brought pursuant to FRCP 12(b)(6) tests the factual basis of the complaint and looks to the allegations viewed in a light most favorable to the Plaintiffs to establish whether a plausible claim for relief has been stated. In doing so, the court must review the allegations in Plaintiffs' favor and may only dismiss the complaint where no plausible claims have been stated. *Total Benefits Plan Agency, Inc., v. Anthem Blue Cross Blue Shield, Inc.* 552 F.3rd 430 (6th Cir. 2008). In conducting its review, a court must liberally construe the allegations set forth by the Plaintiff in their favor. *Johnson v. BAC Home Loans Servicing,* 867 F. Supp. 2d 766 (ED N.C. 2011). Therefore, only where the Court concludes, after reviewing the complaint liberally and in a light most favorable to the Plaintiffs, that no claim has been stated is dismissal under FRCP 12(b)(6) warranted. *Bryant v. McDonough,* 72 F.4th 149 (6th Cir. 2023); *Hunter v. Caliber Systems, Inc.* 220 F. 3rd 702 (6th Cir. 2000). In an Antitrust action, the pleadings must only set forth enough facts to give rise to an inference of a violation under the Act to escape dismissal. *Bell Atlantic Corp. v. Twombley,* 550 U.S. 54; 127 S. Ct. 1955; 167 L. Ed. 2d 929 (2007). Motions to dismiss are generally viewed with disfavor and rarely granted unless it is clear no claim has been

---

[5] See attached Exhibit 5 which documents these allegations.

alleged or could be alleged given the allegations stated. ***Kaiser Aluminum v. Avondale Shipyards,***

***677 F. 2d 1045 (5th Cir. 1982); Campbell v. Wells Fargo Bank, 781 F. 2d 440 (5th Cir. 1986).***

## IV.   ARGUMENT

### A. *Plaintiffs' First Amended Complaint Sets Forth Plausible Antitrust Claims.*

Defendants argue Plaintiffs' Anti-Trust claims should be dismissed as they are vague and conclusory and do not provide Defendants with adequate information about the claims being asserted by the First Amended Complaint (FAC). Further, Defendants claim that the FAC does not set forth plausible facts in defining the "relevant market", "injury", "anticompetitive tying" and their claims regarding an alleged conspiracy. Overall, Defendants claim allegations of mandatory membership in Defendants' organizations is not sufficient to create an Antitrust claim. Plaintiffs maintain the FAC sets forth plausible claims and states a viable anti-trust action.

On November 21, 2024, Plaintiffs filed their FAC with the Court as it may do by right pursuant to FRCP 15 (a) (1).[6] In it, Plaintiffs have addressed all the Defendants claimed deficiencies in the original complaint and also in the revised Motion to Dismiss filed on January 15, 2025. Specifically, Plaintiffs' FAC sets forth in great detail the factual background leading to the filing of this action as well as those issues created by the Defendants' practices which are at the heart of this matter. Plaintiffs delineate in the FAC their claims of (1) Restraint of Trade, (2) Monopoly and (3) Conspiracy.

With respect to the Antitrust claims, Plaintiffs' FAC now states in detail facts supporting their claims that Defendants engage in practices which restrain trade, identify the relevant markets,

---

[6] A copy of Plaintiffs' FAC is attached as Exhibit 6.

and allege that Defendants are monopolists who engage in a monopoly to regulate access and control over the MLS.    Simply put, Plaintiffs have alleged that Defendants' mandatory requirement that all brokers and agents be members of their respective organizations in order to access the MLS, information which is vital to Plaintiffs' ability to conduct business in the residential real estate market, and which is not available from any other source, sets forth plausible claims under both sections of the Sherman Antitrust Act as well as the Michigan Antitrust Act. Further, Defendants coordinated policy and practices of mandating this membership requirement are sufficient to set forth a claim for Conspiracy.

### 1. *Section 1 of the Sherman Antitrust Act:*

Defendants challenge Plaintiffs' claims alleged under Section 1 of the Sherman Antitrust Act arguing that Plaintiffs' FAC fails to set forth the necessary elements for establishing such a claim. Sec. 15 U.S.C. Sec.1 (1973). A review of the FAC illustrates that the requisite elements have been set forth and a plausible cause of action stated.

The Sherman Act, 15 U.S.C., Section 1, prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations.  When examining whether a complaint sufficiently sets forth an Antitrust claim under Section 1 of the Act, the Court must look at whether Plaintiff has alleged (1) standing, (2) the presence of a relevant market, (3) whether there is an unlawful tying arrangement present, and (4) whether there are two (2) products or services which are linked together in the market and which create the possibility of economic coercion. ***Thompson v. Metropolitan Multi List, Inc.* 934 F.2nd 1566 (11th Cir. 1991).**  In reviewing these factors, a Court typically uses the "rule of reason" analysis which evaluates whether the claims are reasonable under the circumstances present.

Specifically, courts examine these factors to see if the conduct has an unreasonable anti-competitive effect on the market. In ***United States v. Realty Multi List, Inc., 629 F.2d 1351 (5th Cir. 1980)***, the court held that a practice is plainly anticompetitive and lacking any redeeming value under the Sherman Act where it "furthers none of the Acts goals and denies parties the option to choose among alternative offers."

A review of the FAC illustrates that Plaintiffs have met the test required for stating a claim under Section 1 of the Sherman Act by alleging sufficient facts to support all these required factors.

### *Standing:*

Concerning the issue of standing, in paragraph 21 of the FAC, Plaintiffs have alleged standing based upon the fact that as realtors and brokers who practice in the residential real estate market, they are the appropriate parties who have suffered an alleged anti-trust injury as a result of the Defendant's actions. In order to set forth a plausible claim for standing, Plaintiff need only allege an "injury in fact" related to Defendant's anticompetitive conduct and a connection between the injury and the alleged violation.  ***Data Processing Service Orgs. v. Camp, 397 U.S. 150; 90 S. Ct. 827; 25 L. Ed. 2d 184 (1970).***

Here, the FAC specifically alleges that Plaintiffs practice in the residential real estate market in Michigan as brokers and agents. The FAC also alleges Defendants' mandatory membership policies require them to be members of organizations in order to transact business in the relevant market. These memberships have a detrimental effect on their abilities to do business in the market as they have no choice to access the MLS without membership, and Defendant's market power and hold on the information contained on the MLS locks out all other competition as there is no other viable alternative for Plaintiffs to access this information. Moreover, the FAC

alleges that those brokers and agents who refuse to be members or who cannot afford membership have no access to the MLS and are also significantly disadvantaged in the market.[7] These factors create an injury to the Plaintiffs and those individuals who are similarly situated.

The FAC also sets forth a connection between the injury and the Defendants' anticompetitive practice. Paragraphs 53 to 67 detail the actions of the Defendants which create a system causing injury to the Plaintiffs. In addition, Plaintiffs also have standing to raise these claims as they are efficient enforcers of the anti-trust laws as brokers and agents practicing in the real estate industry. ***Todorov v. DCH Health Care Authority***, ***921 F.2d 1438 (11th Cir. 1991)***.

Defendants' motion also relies upon a fundamental misstatement that Plaintiffs' acknowledge there is no market wide injury because paragraph 63 of the FAC identifies half of the brokers and agents in Michigan, 16,000 specifically, reside in southeast Michigan and are members of REALCOMP wrongfully concluding that there are another 50% of brokers and agents outside southeastern Michigan who are not members of the MLS and effectively do business in the market without the MLS.  Defendants completely mischaracterize this allegation and the premise behind it. The statement in the FAC is clearly made to identify the location of those agents and brokers in southeast Michigan who rely on the MLS demonstrating the hold the Defendants have on the market and access to the MLS.  It does allege or otherwise state there are another 50% of agents and brokers located outside southeastern Michigan who do not use the MLS. On the contrary, there are approximately 35,000 brokers and agents in Michigan who are required to be members of the NAR, the State Board and a local board. The allegations in the FAC illustrate the control Defendants have on the market and support their claims of anti-competitive practices.

---

[7] See FAC Paragraphs 64-68 (Exhibit 6).

In summary, as brokers and agents who do business in the area of residential real estate in Michigan, the Plaintiffs have standing to raise these claims and have articulated sufficient factual allegations in the FAC to establish this requirement.

### *Relevant Market:*

The FAC also identifies a specific "relevant market". A relevant market has been defined by the courts as products and services available in a certain geographic area. Courts have uniformly held that the parameters of a geographic market are questions of fact for determination by the tryer of fact. ***Graphic Products Distributors Inc. v. Itek Corp., 717 F.2d 1560 (11th Cir. 1983).*** In their FAC, Plaintiffs allege and identify both the relevant market and the geographic parameters.[8] Specifically, Plaintiffs identify the relevant market as the residential real estate market and the geographic region as the state of Michigan.[9] These allegations are set forth plainly in paragraphs14,15,18,19, 22, 23 and 63-67 of the FAC. While Defendants claim that this is not sufficient for them to be able to identify the market, Plaintiffs maintain that the parameters of the residential real estate market in Michigan clearly sets forth a plausible claim sufficient to establish the required product and geographic dimensions.

Further, Plaintiffs FAC has set forth allegations regarding the ***market power*** possessed by Defendants in this market. Plaintiffs allege that the Defendants' control of the MLS and the fact that they tie membership in their organizations to access the MLS creates control over the market. The Defendants mandatory membership policies create significant power over Plaintiffs and those similarly situated because in order for Plaintiffs to effectively transact business, they must be

---

[8] Plaintiffs make these allegations in Paragraphs 18, 27, 53, 56 and 63-66 of Plaintiff FAC (Exhibit 6).

[9] The Court should note that these mandatory practices employed by The NAR and state and local boards are present in all but a handful of states making the potential geographic area much larger than just the state of Michigan. However, for purposes of the FAC, Plaintiffs allege it is the Michigan residential real estate market.

members in Defendant's organizations.  The information on the MLS and the ability to market properties with other agents and brokers is solely controlled by the Defendants.  This creates a situation where Defendants have significant power and use that control over the residential real estate market in Michigan as well as over those individuals such as Plaintiffs.[10]

### *Unlawful Tying:*

The FAC also alleges sufficient facts to identify an unlawful tying arrangement between mandatory membership in Defendants' organizations and access to the MLS. The courts have defined an unlawful tying arrangement as:

> *(1) Two separate products; (2) tied together (i.e. one party forces the other to buy one product to get the other); (3) the seller possess sufficient economic power to coerce the buyer into accepting the tied product;(4) the complained of practice has a "not insubstantial effect" on commerce; and (5) the tying company has an interest in the tied product. Keener v. Sizzler Family Steak Houses, 597 F.2d 453 (5th Cir. 1979).*

Here, the Plaintiffs have alleged sufficient facts to identify the alleged unlawful tying claim. Throughout Plaintiffs' FAC, Plaintiffs allege the Defendants' mandatory membership policies are tied to a broker and realtors' ability to access the information on the MLS. This policy and practice is unlawful as it creates a situation where Plaintiffs have no choice but to be members in all of Defendants' organizations and pay the mandatory fees associated with membership in order to be able to use the tied product; the information contained on the MLS. These allegations are clearly set forth throughout Plaintiffs' FAC.[11] Further, Plaintiffs' FAC also sets forth claims that the product is unique, is not available from any other source and impacts competition because without the access to the MLS, Plaintiffs and others who do not wish to be members of the Defendants'

---

[10] See FAC Paragraphs 52,58,63,65,66, 72 (Exhibit 6).
[11] See FAC Paragraphs 53-73 ( Exhibit 6).

organizations are severely disadvantaged.[12] This conduct violates the principles established in *__Eastman Kodak Co. v. Image Tech Services,__* *504 U.S. 451; 112 S. Ct. 2072; 119 L. Ed. 2d 265 (1992)* wherein the Court prohibited tying arrangements that exploited market power. Further, the tying arrangement employed by Defendants whereby brokers and agents must purchase association membership to access MLS services constitutes a *per se* violation of antitrust law under *__Northern Pac. Ry Co. v. United States,__* *356 U.S. 1; 78 S. Ct. 514; 21 L. Ed. 2d 545 (1958).* This arrangement unreasonably restrains trade by foreclosing competition in the market for MLS services. *__Jefferson Parish Hospital Dist. No. 2 v. Hyde,__* *466 U.S. 2; 104 S. Ct.1551; 80 L. Ed. 2d 2(1984).*

### *__Two Products Linked Together in the Market:__*

In addition, Plaintiffs have adequately identified the two (2) products and services which are tied together as well as the link between them and Defendants' alleged coercion whereby they mandate membership in their organizations in exchange for access to the MLS – access which is crucial to Plaintiffs' ability to transaction business as it contains vital information which is not available from any other source and the ability to market listings to all other realtors. The courts have uniformly held economic power may be inferred from the tying products or services desirability of the group using them or the uniqueness of the products or services and by the control exerted over the tying product. *__U.S. Steel Corp. v. Fortner Enterprises,__* *429 U.S. 610; 97 S. Ct.861; 51 L. Ed. 2d 80 (1977).*

In this instance, the FAC clearly sets forth claims that the two (2) products or services, membership in the defendants' organizations (the tying product) and the information on the MLS

---

[12] See Fac Paragraphs 5,6,8,20,21,58,59,63 (Exhibit 6).

(the product being tied) are linked to the market and further, Defendants' practices in doing so coerce Plaintiffs and others similarly situated.[13]

This is precisely the same issue which was addressed by the Court in ***Thompson v. Metropolitan Multi List, 934 F.2d 1566 (11th Cir. 1991)*** wherein the Court held a Board of Realty **could not** tie membership in their organization with access to the MLS. In ***Thompson,*** the Eleventh Circuit Court of Appeals dealt with almost the exact same set of circumstances as are present here. The Court opined that requiring membership in the Dekalb Board of Realtors in order to access the information on the MLS set forth a viable antitrust action and was harmful to real estate brokers and agents who were not members nor wanted to be members. There, the lower court granted Defendants' motion for summary judgment finding no Antitrust violation. However, on appeal, the circuit court reversed the lower court conclusively holding that the tying of membership in the Board of Realtors to accessing information on the MLS was unlawful and created an antitrust violation. The Court specifically noted that the exclusive right of members of the Dekalb Board of Realtors to use the MLS excluded non-member real estate brokers from using the MLS and was harmful to them and constituted a "unreasonable restraint on trade". This decision opened non-member access to the MLS in Georgia and has since been applied in other states such as California, Florida and Arizona. Plaintiffs seek a similar outcome here.

### The Findling Decision:

Defendants' motion is in large part based upon the decision in ***Findling v. REALCOMP II LTD, No. 17-cv-11255 (E.D. Mich. Mar. 22, 2018).*** In that decision, Honorable Bernard Friedman found that an individual who was not a practicing real estate agent or broker and was therefore not

---

[13] See Plaintiffs' FAC paragraphs 69-74 (Exhibit 6).

eligible for membership in the real estate boards, and not entitled to access the MLS, did not constitute an antitrust violation. The Court's decision was predicated upon the fact that Plaintiff's alleged membership in REALCOMP was voluntary and relied upon the "widely recognized principle" that "private organizations may reasonably tie their benefits and services to membership." The Court opined that because Plaintiff had identified the membership as voluntary, and was not an agent or broker, there were no Sherman Act violations and dismissed the case.

The matter currently before the Court is distinguishable from the ***Findling*** matter is several important ways.  First, the Plaintiffs in this case are all real estate agents and brokers who directly rely upon access to the MLS in order to conduct business. This was not the case in the matter before Judge Friedman as the Plaintiff there was a non-realtor and merely wanted access to the MLS out of convenience. Second, and most importantly, membership in Defendants' organizations is not voluntary but ***mandatory***.  In fact, that is the underlying claim which is at the heart of this litigation. While the Defendants' fail to address this in their motion, the facts as alleged in Plaintiffs' FAC establish this.[14] The Court need only look at the repeated requests made by Plaintiffs to opt out of membership and the unilateral and uniform refusal by the Defendants to this request – a fact which is not disputed.  Defendants have even memorialized this position in writing on several occasions.[15]

Therefore, because of these substantial and compelling differences between the facts and circumstances in this case, those found in the ***Findling*** case, and the decision in ***Thompson,*** Plaintiffs maintain that Defendants' reliance on ***Findling*** is misplaced.  Defendants' Motion should be denied on these grounds as well.

---

[14] See FAC Paragraphs 40, 44,52,54,55, 57,67-69,73 (Exhibit 6).
[15] See Exhibit 1.

## 2. *Section 2 of the Sherman Antitrust Act:*

The Plaintiffs' FAC has also started a claim under Section 2 of the Act.  Under Section 2 of the Act, persons shall not "monopolize or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States, or with foreign nations". There are three (3) criteria which must be alleged when stating a cause of action to monopolize any part of trade or commerce under Section 2 of the Sherman Act. 15 U.S.C. Sec 2 (1973). Plaintiffs must allege (1) the existence of a concerted action; (2) an intent to monopolize; and (3) an overt act to establish a monopoly. *Key Enterprises of Delaware v. Venice Hospital,* 919 F.2d 1550 (11th Cir. 1990). Further, the existence of monopoly power may be inferred from the predominant share of the market and control over the goods and services. *United States v. Grinnell,* 384 U.S. 563; 86 S. Ct. 1698; 16 L. Ed. 2d 778 (1966).

A review of Plaintiffs' FAC reveals that all three (3) of these criteria have been met. In paragraphs 63 to 70 of the FAC, Plaintiffs allege the Defendants participate in a concerted pattern and practice to "intentionally and overtly" enforce their mandatory membership requirements to control the Plaintiffs and other brokers and agents access to the MLS. Moreover, these mandatory requirements create "monopoly control" on the part of Defendants over a broker's and agent's access to this information which is vital to their ability to do business in the residential real estate market. Similarly, Count III of Plaintiffs' FAC reiterates these allegations and facts, and specifically that the Defendants' actions in this regard are done purposefully and overtly and create a monopoly situation.[16]

---

[16] See FAC Paragraphs 109-119 (Exhibit 6).

For these reasons, Plaintiffs have set forth a plausible claim under Section 2 of the Sherman Antitrust Act and request that Defendants' motion be denied in this regard as well.

### 3. *The Michigan Antitrust Act:*

The Michigan Antitrust Act, MCL section 445.771, prohibits any legal entity from using a contract, combination of entities or a conspiracy between two or more persons in the restraint of or to monopolize trade or commerce in a relevant market. In order to state a claim under the Michigan Antitrust Act, the Court typically examines whether the Plaintiff's complaint alleges five (5) factors: (1) a causal connection between the anti-trust violation and the harm; (2) the nature of Plaintiff's alleged injury; (3) the directness of the injury; (4) the potential for duplicative recovery; and (5) the existence of more direct victims. *Southaven Land Company, Inc. v. Malone Hyde, Inc. 715 F.2d 1079 (6th Cir. 1983).*

Here, Plaintiffs have alleged sufficient facts which support each of the five (5) required elements. Plaintiffs challenge the compulsory requirement of mandatory membership in each of the Defendants' organizations to access the information on the MLS. In their FAC, Plaintiffs have alleged a connection between the anti-trust violation and the harm Plaintiffs have incurred in that Defendants' practices here preclude any realtor who does not wish to belong to the defendants' organizations and pay their membership fees is foreclosed from accessing information which is vital to a realtor's ability to conduct business in the market place and which is not available from any other source. Similarly, Plaintiffs' FAC specifically alleges both the injury incurred (lack of access to the MLS) and the directness of that injury (the inability of real estate brokers and agents to effectively do business without access). Moreover, given that Plaintiffs are brokers and agents who practice in the residential real estate market, they are direct victims of the Defendants'

practices and appropriate candidates to raise these issues. As brokers and agents who are directly affected by these mandatory requirements, there is little or no chance that some other group would qualify to bring these same claims, thus eliminating the chance of duplicative recovery.

For these reasons, as well as those already discussed herein, Plaintiffs have adequately set forth a claim under the Michigan Antitrust Act sufficient to allow this claim to move forward. Defendants' Motion in this regard should be denied.

**B.   _Plaintiffs' First Amended Complaint Sets Forth A Plausible Conspiracy Claim._**

Defendants have also moved to dismiss the Plaintiffs' Conspiracy Claim. There are three (3) elements which Plaintiffs must allege to set forth a claim for conspiracy under these circumstances.   Plaintiffs must only allege: (1) the existence of concerted action by knowing participants; (2) an intent to monopolize; and (3) an overt act.   _**Key Enterprises of Delaware v. Venice Hospital, 919 F.2d 1550 (11th Cir. 1990).**_

Plaintiffs' FAC alleges Defendants knowingly participated in concerted actions which establish the elements for a claim of conspiracy. Specifically, Plaintiffs allege the Defendants' practices and policies which uniformly and collectively require membership in all their organizations in order to access the MLS is a knowing, concerted and overt act.[17]  Further, these uniformly enforced policies and practices are critical to form the basis for substantial economic benefit for each of the Defendants. Importantly, Defendants do not deny in their motion that they act in concert to enforce these mandatory membership requirements or that these requirements generate substantial economic benefit for each of them. In fact, these mandatory membership fees are a clear and undeniable incentive for these practices and policies to continue. The combined

---

[17] See Plaintiffs' FAC paragraphs 121-134 (Exhibit 6).

efforts of and uniformity in the Defendants' practices of mandating membership in order to access the information on the MLS is sufficient to establish "concerted action" as defined by the courts. ***Interstate Circuit v. United States*, 306 U.S. 208, 59 S. Ct. 467 (1939).**

Further, Plaintiffs FAC alleges that Defendants' control over the MLS creates a monopoly and prevents competition as there is no option but to join the Defendants' organizations in order to access the information maintained there and to market their properties to other agents and brokers. The longstanding test for stating a monopoly claim is set forth in ***United States v. Grinnell*, 384 U.S. 563; 86 S. Ct. 1698; 16 L. Ed. 2d 778 (1966)** and consists of two (2) elements; (1) the possession of monopoly power and (2) the exercise of it in the market. Plaintiffs' FAC repeatedly alleges that Defendants exclusive control over the MLS and required mandatory membership in their organizations in order to access that information satisfies both of these elements. Defendants' exclusive control constitutes ***"monopoly power"***, and they clearly ***"exercise this control"*** in the market by tying access to the MLS with their mandatory membership requirements.

Based upon the foregoing, Plaintiffs' FAC has set forth a plausible conspiracy claim, and Defendants' motion should be denied here as well.

## V. **CONCLUSION**

Despite Defendants' efforts to portray Plaintiff's FAC as a hollow set of allegations with no legal or factual basis, a close examination of Defendants' arguments reveals they are conclusory and non-persuasive. The claims stated in the FAC are quite simple. Defendants' conduct as illustrated through their mandatory requirement that all brokers and agents be members of their organizations in order to access the MLS and the associated ability to market properties is unlawful and creates Antitrust violations, and their uniform enforcement of those practices to control the

market creates a conspiracy.  Reviewing the FAC in a light most favorable to the Plaintiffs and in conjunction with the ***Thompson*** decision and the other case law cited above, Plaintiffs maintain their FAC sets forth plausible claims establishing a viable cause of action under Sections 1 and 2 of The Sherman Act, The Michigan Antitrust Act and sets forth a viable claim of Conspiracy. Further, Plaintiffs believe that in reviewing the allegations set forth in the FAC in light of the other actions filed in federal district courts following the initiation of this matter, alleging the same violations, further substantiates the viability of the claims currently before this Court.  For all of these reasons, Defendants' Motion should be denied in its entirety, and this matter should be allowed to proceed.

Although Plaintiffs believe their FAC is more than adequate to survive Defendants' motion, in the event the Court believes the Plaintiffs' FAC is deficient, Plaintiffs request leave to file an amended complaint pursuant to FRCP 15 (B) (2).

Respectfully Submitted,
*/s/ Michael S. Clawson*
Attorney for Plaintiffs
41000 Woodward Ave., Suite 395 E
Bloomfield Hills, Michigan 48304
(248)433-4366
msc@mikeclawsonlaw.com

February 21, 2025

## CERTIFICATE OF SERVICE

Michael S. Clawson certifies that he served a copy of the foregoing document upon each counsel of record through the electronic court filing system on February 21, 2025 and independently via e-mail transmission.

*/s/ Michael S. Clawson*
Attorney for Plaintiffs

# EXHIBIT 1

Sent: Wednesday, July 24, 2024 3:42 PM
**To:** Douglas Hardy <dhardy@signaturesothebys.com>
**Cc:** Karen Kage <Kkage@corp.realcomp.com>; patjacobs1121@gmail.com
**Subject:** RE: NAR Termination and RealComp Provided Compensation forms

Per Karen's e-mail, it appears that it is not possible to terminate your membership with the Realtor® organizations
and keep your Realcomp membership.

For what it's worth, NAR's responses to such membership questions read as follows:

**Is it possible to only pay local and state dues and not NAR dues?**

No. There is no ability to divide membership among local, state, or national associations.

**Are there any REALTOR® associations that I can join that don't require me to belong to NAR?**

The term REALTOR® is a registered trademark of the National Association of REALTORS® and only local and state
associations enforcing NAR's trademark, membership qualifications, and Code of Ethics are considered
REALTOR® associations.

**Is NAR going to change its membership structure? Will NAR allow members to separate membership into
local/state/national only?**

NAR is not considering changes to the membership structure.

Rob

---

**From:** Douglas Hardy <dhardy@signaturesothebys.com>
**Sent:** Wednesday, July 24, 2024 12:05 PM

1

**To:** Robert Campau <rcampau@mirealtors.com>
**Cc:** Karen Kage <KKage@corp.realcomp.com>; patjacobs1121@gmail.com
**Subject:** Re: NAR Termination and RealComp Provided Compensation forms

Rob, thank you so much for your reply, but you did not actually answer the main part of my email.  Additionally, I believe no MLS should provide any compensation forms in any way per the NAR settlement.

Most importantly- am I able to terminate my membership in MAR and still be a participant in my MLS and if your answer is no why not?

Doug

On Wed, Jul 24, 2024 at 12:00 PM Robert Campau <rcampau@mirealtors.com> wrote:

Dear Doug,

I am sorry to read that you no longer wish to be a Realtor®. While I can't speak to Realcomp's participant/subscriber requirements, I can say that our various Michigan MLSs and associations have a very important educational role to play in the coming months. Traditionally, part of that role is the development of optional real estate forms to support our Realtors® and their clients.

Regarding your concern with the Realcomp Cooperation and Compensation Agreement, I can't speak to the substance of that form or how the form will be incorporated within Realcomp's library. One thing that is clear, however, is that the provision of forms is not a violation of the settlement. In fact, we believe that easily understandable and enforceable forms are more important than ever. Pulling directly from NAR's FAQs, the two primary changes under the settlement are:

- **Compensation offers moved off MLS:** NAR has agreed to put in place a new rule prohibiting offers of compensation on an MLS. Offers of compensation could continue to be an option consumers can pursue off-MLS through negotiation and consultation with real estate professionals. And sellers can offer buyer concessions on an MLS (for example—concessions for buyer closing costs).
- **Written agreements for MLS Participants acting for buyers:** While NAR has been advocating for the use of written agreements for years, in this settlement we have agreed to require MLS Participants working with buyers to enter into written agreements with their buyers before touring a home.

Given these parameters, the existence of a form that supports cooperating compensation is not the same as a mandatory MLS policy that prohibits publishing offers of compensation on the MLS. Michigan Realtors® has also recently published a form intended to provide listing brokers with a tool to better

formalize their seller-authorized offers of compensation – laying out the criteria for how such an offer is earned. In the instance where a seller has approved an offer of compensation to a cooperating broker, it will be particularly important for a listing broker to communicate its offers of compensation with a greater sense of formality. Historically, as you know, when a listing broker made an offer of compensation to cooperating brokers through the MLS, the conditions for collecting that amount did not need to be spelled out.  The conditions for collecting the amount offered through the MLS were governed by the arbitration manual.

Now that offers of compensation will be made outside of the MLS, these same terms no longer automatically apply.  Going forward, if a listing broker offers cooperating brokers compensation – whether via its website or an email or text—the listing broker also needs to establish the rules for collecting that amount.  Remember that under current Michigan law, agreements between brokers to share a commission need not be in writing.  Two Realtors® who discuss a split orally—or via text—can walk away from that exchange with two very different understandings as to what they agreed to.  To avoid arguments as to the agreed upon terms, we believe it is important that the conditions for collecting a commission are reduced to writing – or at least communicated with consistency and detail. The new MR compensation agreement between brokers incorporates the same basic conditions previously provided as part of the MLS/arbitration rules. If you didn't see it in the email communication last week, I have attached it to this communication.

I am hopeful that the above information addresses some of your concerns.  While disheartened to read that you no longer wish to be a Realtor®, I am also hopeful that you will reconsider that notion in light of the great value in advocacy and legal work you know we provide. Without doubt, every strata of Realtor® membership will be playing important roles, both in the near and long term.

Rob

*Robert M. Campau, Esq.*

*Chief Executive Officer, Michigan Realtors®*



**AT HOME WITH
DIVERSITY**

---

**From:** Karen Kage <kkage@corp.realcomp.com>
**Sent:** Wednesday, July 24, 2024 10:38 AM
**To:** dhardy@signaturesothebys.com; patjacobs1121@gmail.com; Robert Campau
<rcampau@mirealtors.com>
**Cc:** dhardy@skbk.com
**Subject:** RE: NAR Termination and RealComp Provided Compensation forms

Good morning, Doug. Thank you for your message.

As this time, Realcomp's governing document require subscribers to be REALTORS with an active
membership in NAR, MiRealtor, and a local board/association. We have been researching discontinuing
the requirement for NAR and MiRealtor membership but have not yet reached a conclusion on how or if
we will move forward with this change. We will communicate with all of our subscribers if these
requirements are changed.

You can upload your individual compensation agreement into Realcomp's forms library for availability
to your agents in your office folder. However, you cannot make the form public and it cannot be

attached to individual listings as part of the documents that are available to other subscribers. You would need to complete the form and send it to the specific agent requesting that information. This is the understanding we have reached with NAR to allow these forms to be available.

I hope this helps. Let me know if you have additional questions.

Karen S. Kage, CEO

Realcomp II Ltd.

248-699-9120

www.realcomp.com

www.moveinmichigan.com



---

**From:** dhardy@signaturesothebys.com <dhardy@signaturesothebys.com>
**Sent:** Tuesday, July 23, 2024 3:48 PM
**To:** Karen Kage <kkage@corp.realcomp.com>; patjacobs1121@gmail.com; rcampau@mirealtors.com
**Cc:** dhardy@skbk.com
**Subject:** NAR Termination and RealComp Provided Compensation forms

Karen, Rob and Pat – I would like to formally request that I be allowed to terminate my membership with NAR, MAR and NOCBOR and still maintain access and subscription to REALCOMP as each of my agents holds a valid active license with the State of Michigan.

Please Let me know how to proceed with this request.

Additionally – Could you each explain how RealComp is providing a form to all members titled " Co-Broker Cooperation and Compensation Agreement" ?

Currently we are told we cannot upload our individual compensation agreements to RealComp's forms library Docs++ but yet RealComp can provide this?  Doesn't the NAR settlement preclude the MLS from the mention of compensation?

Thank you,

Doug

Douglas H. Hardy, MD | Chairman

**Signature Sotheby's International Realty**

Birmingham | Bloomfield Hills | Grosse Pointe | Northville

p 248-505-5100 | f 248-853-8506

**The road to tyranny, we must never forget, begins with the destruction of the truth.**

Bill Clinton - 42nd US President

# EXHIBIT 2

| Name | State |
|---|---|
| Constence Kelley | ID |
| Brett Harris | VA |
| Bonnie Crowley | OR |
| Hunter Finch | OR |
| Fred Glick | TX |
| William Kehoe | FL |
| Nicole ( Nick) Arminio | NY |
| Carla DeYoung | LS |
| Heidi Segrin | IL |
| Jim D'Amico | C21 11 States |
| Alexandra Mersiconia | CA |
| William Landry | FL |
| Mauree Tacacchi | MO |
| Lauire Olson | MI |
| Bricker Bruner | TX |
| John Diaz | CA |
| Anthony Phillips | NV |
| Jessica Baker | OH |
| Jeremy Rodriguez | OH |
| Lou Allen | TX |
| Dan Erinberg | IL |
| Jeremy Davalos | AZ |
| Hayley Hercules | MO |
| Dawn Cohen | FL |
| Dawn Rucinzki | GA, ID, CA Sout |
| Lori O'Neill | OH |
| Dennis Kuty | FL |
| Lucie Roth | PA, FL |
| Judy Parker | NJ |
| Dan Rogers | OH |
| Meghan Keever | FL |
| Bill | |
| Britney Inglis | WA |
| Rebecca Disney | FL |
| Jill Doppel | NY |
| Jean Brake | WA |
| Bill Barbee | NC |
| Christina Provost | TX |
| Kevin Grinvalsk | WI |
| Aaron Brahnen | WI |
| Joshua Coon | TN |

| | |
|---|---|
| Phantasa Rose | AL |
| Johnny Horton | TX |
| Jocelyn Tucker | MI |
| Scot Brothers | MI |
| Sylvia Wright | FL |
| Kristina Gamble | OH |
| Michael Ruiz | FL |
| Andrew Li | OH |
| Devin Sanchez | OH |
| Rober Levine | MI |
| Jennifer Hamilton | MI |
| Amy Visciglia | CT |
| Janice Johnson | CT |
| Douglas Thomas | MI |

# EXHIBIT 3

Brokers in Three States Suing NAR or Local Associations — RISMedia https://www.rismedia.com/2025/01/13/nar-suits-antitrust-discriminati...

NEWS     PREMIER     REPORTS     EVENTS     POWER BROKER

NEWSMAKERS     MORE ˅

Search...     🔍

Agents     Brokers     Teams     Marketing     Coaching     Technology     ☰ More

Join Premier

# BROKERS IN THREE STATES SUING NAR OR LOCAL ASSOCIATIONS WITH DISCRIMINATION AND ANTITRUST CLAIMS

A series of lawsuits from agents have focused on discrimination and antitrust violations involving mandatory REALTOR® memberships, often required to access MLS data.

HOME › AGENTS

By Clarissa Garza     January 13, 2025     Reading Time: 8 mins read     💬

X

Brokers in Three States Suing NAR or Local Associations — RISMedia   https://www.rismedia.com/2025/01/03/nar-discriminati...



A recent lawsuit filed in Louisiana is taking direct aim at the National Association of REALTORS® (NAR), the Louisiana REALTORS® Association and several local groups, alleging antitrust violations, discriminatory practices and restrictive tying arrangements.

The case, filed by four Louisiana agents and brokers, echoes similar concerns about equity and competition within the real estate industry that were previously raised by <u>brokers in Michigan</u> and <u>another broker in Pennsylvania</u>, who have filed separate federal lawsuits over the last several months.

Another case filed last year in Pennsylvania is making similar allegations, while a previously unreported case filed against the New Mexico Association of REALTORS® alleges discrimination and wrongful termination. Altogether, the cases represent an escalation of legal action based on sometimes overlapping claims of discrimination and antitrust violations.

Most, but not all are filed pro se, meaning plaintiffs are representing themselves.

The Louisiana case, filed January 2, claims that mandatory REALTOR® memberships, often required to access critical Multiple Listing Services (MLS) data, constitute anticompetitive practices and unlawful tying arrangements.

"Such practices limit competition, harm consumers, and disproportionately affect all real estate professionals within the real estate industry," read the court filing. "The defendants impose tying requirements on appraisers, despite there being no legitimate reason for appraisers to be members of these associations to access the MLS data needed to accurately serve the lending industry and protect consumers."

Led by Carla DeYoung, a real estate broker and certified residential appraiser, all four plaintiffs are required to pay dues and be members of three associations in order to become members of the MLS serving their market area.

Along with NAR, DeYoung is suing the following defendants:

- Louisiana REALTORS® Association (LRA)
- Greater Baton Rouge Association of REALTORS® (GBRAR)
- New Orleans Metropolitan Association of REALTORS®
- Bayou Board of REALTORS®
- Greater Central Louisiana REALTORS® Association
- REALTORS® Association of Acadiana
- ROAM MLS, LLC, a consortium of the above board associations
- Kenneth Daman, the registered agent for ROAM MLS, LLC and executive vice president of the Greater Baton Rouge Association of REALTORS®

Some of the plaintiffs are current members of ROAM MLS and some have canceled their memberships due to concerns regarding potential violations of the law, according to the court filing.

The Board associations require individuals to maintain membership with NAR, LRA and a REALTOR® board within the state of Louisiana to qualify for membership in the MLS that serves the plaintiff's market area.

ROAM MLS is serviced by a third-party platform, Paragon MLS. The board association controls the data provided to Paragon MLS.

Excluding non-association real estate professionals from accessing the MLS has not only favored certain professionals over others, but has hindered the market, "disproportionately impacting minority consumers and real estate professionals by limiting access to essential data."

The importance of MLS access is crucial to a broker's success, as noted in a **report by the Federal Trade Commission**.

"MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS," read the report.

It's also important for "substantially reducing transaction costs," noted the report.

"Brokers using the MLS reduce the costs of matching buyers and sellers, and can market their service to a large set of potential clients. Further, by stating upfront the compensation being offered to a cooperating broker, the MLS can reduce the costs associated with listing brokers having to negotiate separately with each potential cooperating broker."

The plaintiffs urge the Court to recognize that MLSs—including those operated by local board associations and those governed by rules mirroring NAR policies—should operate independently from such frameworks "that may perpetuate antitrust violations."

When asked about MLS access, an NAR spokesperson told RISMedia that each MLS determines its requirements, not NAR.

"NAR does not require that MLS access be limited to NAR members. MLSs are operated at the local level and each MLS determines individual participation requirements," the spokesperson wrote in an email.

Going beyond the antitrust and tying arrangements, the case alleges reputational damage placed upon the entire real estate industry.

With no shortage of widely publicized scandals surrounding NAR—including sexual harassment allegations, extravagant spending and antitrust violations related to the Participation Rule and Clear Cooperation Policy, outlined the filing—this

reputation follows the industry as a whole, alleges the filing.

"The public's inability to differentiate between REALTORS® and non-REALTORS® ensures that this damage extends to all real estate professionals," read the filing.

Back to NAR, the plaintiffs further claim that the association's recent rule changes—such as removing offers of buyer compensation from the MLS and the enforcement of exclusive buyer agreements—establish unfair barriers to market entry and violate the Fair Housing Act by "disproportionately impacting minority communities through restrictive policies."

By requiring real estate professionals to enforce these new rules, the plaintiffs argue that it makes them carry the entire burden, resulting in harm—including lost business opportunities, reputational damage, emotional stress and financial losses.

Due to a lack of transparency and the unilateral decisions in the Sitzer-Burnett case, specifically, the plaintiffs in this case have experienced "severe emotional distress, including anxiety, frustration and a sense of betrayal."

Despite this, these agents still need to continue their association memberships, so long as they want to continue using the MLS.

"Real estate agents who choose not to be controlled by association overreach suffer adverse consequences due to the loss of MLS access, significantly hindering their ability to compete effectively in the marketplace," read the filing.

Ultimately, the plaintiffs seek damages and significant structural changes, including an end to mandatory association memberships for MLS access. If successful, this lawsuit could set a precedent for how MLS systems are governed and pave the way for a more inclusive and competitive real estate industry.

RISMedia reached out to DeYoung, who said that she and the plaintiffs have received overwhelming support from their industry peers since last week's filing.

"We have received overwhelming backing, not only from our local area, but also from brokers and agents across the country," she wrote in an email. "Many have reached out to express their gratitude for our actions in providing a voice for the challenges we have all been facing—especially since many of these agents feel unable to publicly express their concerns."

Although they are not involved in the lawsuit, DeYoung said she has full confidence in the Louisiana Real Estate Commission, whose mission is to serve and protect the public interest in real estate transactions and other real estate-related activities.

"Their willingness to listen to our voices when needed and to stand firm in challenging situations gives us assurance as we move forward."

**Similar lawsuits in Pennsylvania and New Mexico**

Two recent cases in Pennsylvania and New Mexico also call out NAR and local associations for antitrust violations regarding MLSs while also detailing alleged first-hand discrimination that was "ignored" by associations.

In a case filed in Pennsylvania Nov. 25, 2024—Preston Moore, who served as the first Black president for the Pennsylvania Association of REALTORS® (PAR)—is suing NAR, PAR and other associated boards, claiming they have engaged in discriminatory practices, particularly in the enforcement of rules that disproportionately affect minority members.

Other organizations included as defendants include the New York REALTOR® Association, the New Jersey REALTORS®, the Pennsylvania Real Estate Commission and the Black Caucus of the Pennsylvania House of Representatives.

PAR suspended Moore in June 2024, just five months after he was named president of the association, he said. He continues

Brokers in The States suing NAR or Local Associations - RISMedia    https://www.rismedia.com/2024/09/23/mergers-antitrust-discriminati…

to pay full membership dues, while denied access to full membership benefits, according to the filing.

In the filing, Moore states that he has personally experienced racial bias from both NAR and PAR. He alleges that NAR has failed "to provide due process in the context of harassment allegations, particularly where high-level leaders" are involved. This absence of a thorough investigation for allegations constitutes a denial of fair treatment and due process, he said.

According to the court document, there is evidence that group text messages proving these injustices were intentionally deleted.

This is set to become a class-action lawsuit, as the filing states other individuals are waiting to be added to the complaint.

Aside from suing for discrimination, Moore is suing the defendants for antitrust and monopolistic practices through forced memberships.

NAR's MLSs force professionals in the industry to become members, stifling competition and limiting market access —"forcing professionals to comply with NAR's rules and dues without viable alternatives," read the filing. Further, these forced memberships disproportionately affect minority and lower-income folks who lack the financial means to pay the imposed dues.

The Louisiana and Pennsylvania lawsuits touch on both antitrust and discriminatory practices. Another case filed in New Mexico in late August 2024 by Zachary Benjamin against the New Mexico Association of REALTORS® (NMAR) focuses on alleged discriminatory allegations, violations of the New Mexico Human Rights Act and breaches of contract.

Benjamin was fired from his role as NMAR's chief executive officer only a few months into his three-year contract—a contract he relied on when he relocated from California to New Mexico with his wife and six-year-old daughter, he claimed.

Benjamin alleges that he was fired and subjected to harassment and discrimination based on his Jewish religion.

In the court document, Benjamin said that he was cautioned about expressing his religion, observing Jewish holidays or expressing pro-Israel statements, as it would "give ammunition" for NMAR board members to take disciplinary action against him. Further, this discrimination increased throughout his tenure and became the basis for the NMAR board and staff to build their case to terminate him.

He was not provided with a written notice on any performance issues before being fired and NMAR refused to provide written documentation on its "Just Cause" to Benjamin, according to the filing. Instead, NMAR informed him orally that it was due to his efforts in investigating the potential sale of the New Mexico Multiple Listing Service (NMMLS) and concerns about his investigation into the proper classification of NMAR's employees.

Allegedly, NMAR's management and president were aware of the harassment but failed to take any actions against it, despite the company's anti-discrimination policies.

Lola Franklin, CEO at NMAR, did not return RISMedia's request for comment.

*To review the filings, see here for the lawsuits from* **Louisiana**, **Pennsylvania** *and* **New Mexico**.

Tags:    Antitrust Lawsuits    Bayou Board of REALTORS®    Carla DeYoung

Greater Baton Rouge Association of REALTORS®    Greater Central Louisiana REALTORS® Association    LLC

Louisiana Real Estate Commission    Louisiana REALTORS® Association    NAR    National Association of REALTORS®

New Orleans Metropolitan Association of REALTORS®    NMAR    Paragon MLS    Preston Moore

Real Estate Lawsuits    REALTORS® Association of Acadiana    ROAM MLS    Zachary Benjamin

 **Real Estate News**

Illustration by Real Estate News/Shutterstock

**MLS/ASSN**

# NAR hit with another lawsuit over 'forced membership'

A case filed in Pennsylvania challenges membership rules and accuses associations of discriminatory treatment of minority real estate professionals.

Dave Gallagher

October 21, 2024      🕐 3 mins

The National Association of Realtors is, once again, the target of litigation from within the industry.

A new lawsuit filed last week challenges NAR's mandatory membership policies, similar to an earlier case filed in Michigan, but the latest suit also includes allegations of discrimination.

**The case:** On Oct. 16, Maurice Muhammad of Progressive Realty filed a complaint in U.S. District Court's Eastern Pennsylvania district over a policy that requires agents to join NAR in order to gain access to listings on association-owned MLSs.

The Pennsylvania Association of Realtors and the Greater Lehigh Valley Multiple Listing Service were also named as defendants.

The suit focuses on two related areas: NAR membership policies in general, and the alleged discriminatory effects of those policies.

**A membership monopoly:** In the filing, Muhammad argues that mandatory NAR membership violates antitrust laws "by maintaining a monopoly over MLS services and forcing real estate professionals into mandatory membership" with the three parties named in the suit — NAR, the state association in Pennsylvania and the Greater Lehigh Valley MLS, which is owned and operated by Greater Lehigh Valley Realtors.

Due to the structure of association-owned MLSs, "real estate professionals are compelled to join NAR to gain access to MLS listings, without which they cannot conduct business effectively," Muhammad claims.

**Discrimination, selective discipline and a lack of representation:** Muhammad further alleges that such policies have led to "a coercive environment that disproportionately affects minority professionals who lack the financial resources to afford mandatory membership fees" and who "receive little to no benefit from such membership and face discrimination within these organizations."

Specific discriminatory practices, according to the filing, include "selective enforcement of professional rules, inequitable application of disciplinary measures, and the exclusion of minority professionals from leadership positions." Muhammad cites the "overwhelmingly non-diverse" leadership structures at the three organizations as a contributing factor.

While the filing doesn't provide details, Muhammad asserts that he personally received discriminatory treatment "including biased handling of complaints and unfair enforcement of membership obligations."

**What the plaintiff is seeking:** Along with the elimination of membership requirements, Muhammad is requesting a number of reforms, including policies that ensure greater representation of minority professionals in decision-making roles at the associations and the establishment of an impartial dispute resolution system.

He has also asked for monetary compensation of no less than $5.6 million in addition to punitive damages.

**Related complaints:** In August, a group of Michigan agents sued NAR as well as their state and local Realtor associations over the mandatory membership rule. The lawsuit came after the plaintiffs said they contacted the organizations multiple times to request MLS access without a membership requirement.

Case 2:24-cv-12102-JJCG-DRG   ECF No. 30, PageID.510   Filed 02/21/25   Page 46 of 97

gchampion@skbk.com

NEWS     PREMIER     REPORTS     EVENTS     POWER BROKER

NEWSMAKERS     MORE ⌄

Search...

Agents    Brokers    Teams    Marketing    Coaching    Technology    ☰ More

Join Premier

# NEW LAWSUIT HITS NAR, OTHER GROUPS OVER 'FORCED MEMBERSHIP REQUIREMENT'

One Pennsylvania broker asserts civil rights violations and discriminatory practices hurt minority real estate professionals.

HOME  ›  AGENTS

By Michael Catarevas    October 23, 2024    Reading Time: 2 mins read    💬

X



In a lawsuit filed October 16 in the U.S. District Court in Eastern Pennsylvania, broker Maurice Muhammad, representing himself, is suing the National Association of REALTORS® (NAR), the Pennsylvania Association of REALTORS® and the Greater Lehigh Valley MLS (GLVMLS) for $5.6 million over the requirement that he become a REALTOR® in order to be able to access the MLS.

In the filing, Muhammad, residing in Allentown, Pennsylvania, and working at Progressive Realty, claims "violations of federal civil rights statutes, unlawful discriminatory practices, violations of federal antitrust laws, breach of contract, and for creating a monopolistic system that imposes forced membership."

"The forced membership requirement imposed by NAR, PAR, and GLVMLS creates a coercive environment that disproportionately affects minority professionals who lack the financial resources to afford mandatory membership fees."

Back in August, a trio of real estate professionals in Michigan <u>sued NAR and their own local associations over MLS membership requirements</u>. The legality of restricting MLS access currently depends on jurisdiction, with different federal courts offering conflicting rules.

Factual allegations included in Muhammad's lawsuit include:

- Defendants have engaged in a pattern of discriminatory practices against minority real estate professionals, including Plaintiff. These practices include selective enforcement of professional rules, inequitable application of disciplinary measures and the exclusion of minority professionals from leadership positions.

- A report by Community Legal Services of Lehigh Valley (CLCV) revealed systemic bias in how real estate transactions involving minority professionals and clients are handled. The report highlights stark disparities in the treatment of minority professionals by Defendants.

- Minority members of NAR, including Plaintiff, have been subjected to unequal enforcement of ethical standards, while similarly situated non-minority members have not faced comparable scrutiny.

- The leadership structures within NAR, PAR and GLVMLS are overwhelmingly non-diverse, leading to policies and decisions that fail to protect minority members or address their specific needs within the profession.

- Plaintiff has been personally subjected to discriminatory treatment by Defendants, including biased handling of complaints and unfair enforcement of membership obligations.

The complaint seeks a jury trial.

RISMedia reached out to Muhammad and NAR seeking comment. A NAR spokesperson emailed the following:

"NAR is an organization that represents a broad membership across the United States and deeply values diversity, equity and inclusion. We strongly advocate for fair housing practices and inclusive policies that enable home ownership, and our commitment extends to both the millions of consumers and the real estate professionals who work on their behalf. Concerning the recently filed pro se complaint, NAR has not yet been served but we will prepare a response to the allegations raised as appropriate."

**Tags:**  Antitrust Lawsuits    Eastern Pennsylvania    GLVMLS    Greater Lehigh Valley MLS    Maurice Muhammad

Minority Realtors    MLSNewsFeed    NAR    NAR Membership    National Association of REALTORS®    PAR

Pennsylvania Association of REALTORS®    Real Estate Agents    Real Estate Lawsuits    U.S. District Court

[f] Share                              [🐦] Tweet                              [in] Share                              [↱]



### MICHAEL CATAREVAS

Michael Catarevas is a senior editor for RISMedia.

**RELATED POSTS**

AGENTS

**COSTAR SEES REVENUE, TRAFFIC GROWTH, REAFFIRMS INVESTMENTS**

🕐 October 24, 2024

ECONOMY

**MORTGAGE RATES SEE FOURTH STRAIGHT WEEK OF INCREASES**

🕐 October 24, 2024

AGENTS

**PLAINTIFFS MOVE TO BLOCK PROPOSED EXP SETTLEMENT IN SMALLER CASE**

🕐 October 24, 2024

∧

# EXHIBIT 4


☰ ⦿ **Real Estate News**

Subscribe



*Illustration by Lanette Behiry/Real Estate News; Shutterstock*

**MLS/ASSN**

# NAR hits Phoenix Realtors with cease-and-desist over MLS Choice

The option lets brokers access the MLS outside the "traditional three-tier membership system." NAR says it is "maintaining standards for the Realtor brand."

👤 Stephanie Reid-Simons

Updated December 19, 2024    🕐 3 mins

✉ 𝕏 in f 🦋 🔗

The National Association of Realtors has sent a cease and desist letter to Phoenix Realtors, saying that <u>the association's new MLS Choice option</u> "purports to allow real estate licensees to become members of PAR without becoming a member of the Arizona Association of Realtors or NAR."

In an email sent Dec. 18 by NAR to its board of directors, association leaders and others,

NAR General Counsel Lesley Muchow said it was taking "necessary action" to defend its <u>three-way agreement</u>, which requires Realtors to join local, state and national associations, and to enforce the NAR constitution and bylaws.

**What is MLS Choice?** The Phoenix Realtors site describes <u>MLS Choice</u> as a way for brokers to "offer their agents the opportunity to access both the MLS and legal forms, along with several existing benefits, outside of the traditional three-tier membership system."

MLS Choice costs $249 annually — less than half the price of a three-tier membership. The site distinguishes MLS Choice from association membership, stating that real estate professionals who choose it cannot call themselves "Realtors" and will lose access to association benefits.

**What Phoenix Realtors — and a local brokerage leader — had to say:** Andy Fegley, CEO of Phoenix Realtors, <u>told Real Estate News in November</u> that his organization "will always support NAR." He described MLS Choice as a "modernization" effort to "create a choice for brokers on how they wish to run their business" and said other associations have offered similar levels of choice.

Real Estate News has reached out to Fegley for comment on NAR's cease-and-desist action and its assertion that MLS Choice allows local Realtor association membership.

Bret Lamberson, designated broker and in-house counsel for Russ Lyon Sotheby's International Realty, said on Thursday that his Arizona-based company is evaluating MLS Choice as an option. Lamberson made clear that he views NAR as "a very powerful ally for our entire profession."

"I'm always one for evolution," Lamberson added. "But I also want to have reasonable reassurance that these new alternatives have staying power."

**What NAR had to say:** Realtor associations are "chartered to strengthen the Realtor organization to benefit its members and the consumers they serve and set and enforce standards for ethical real estate practices," Muchow said in the email to leaders.

"To be clear, NAR does not require that real estate professionals be members of a Realtor association to access an MLS. MLS participation is determined at the local level," the letter continued. "NAR continues to promote competition and supports pro-consumer local broker marketplaces. This is a matter of maintaining standards for the Realtor brand as we always have and will continue to do."

**Resistance to membership rules:** NAR has faced increasing pushback against membership requirements in recent months. <u>Several lawsuits have been filed by agents</u>

and brokers challenging membership rules; the Alabama Association of Realtors asked NAR in September to make membership in the national association optional; and most recently, two large brokerages — Realty ONE and HomeSmart — announced they will allow their agents in Arizona to opt out of NAR membership in 2025.

Real Estate News has reached out to NAR for additional comment on its cease-and-desist action, including what will happen if the Phoenix association does not comply.

Write to Stephanie Reid-Simons.

Zillow

New consumer trends and insights for agents

Watch now

12/20/2024, 9:22 AM

# HOUSINGWIRE

INVENTORY (i) **650,992** **-16,474**     30-YR FIXED (i) **7.09%** **0.00**

| Agent | Real Estate |

# NAR steps up the battle against Phoenix Realtors

## NAR is looking to revoke PAR's charter after the local trade group refused to end its MLS Choice membership program

December 26, 2024, 4:02 pm *By Brooklee Han*

The **National Association of Realtors** (NAR) has taken things a step further in its battle with **Phoenix Realtors** (PAR) over the local trade group's MLS Choice program. On Monday, NAR notified its leadership and

members that it had made the decision to initiate the charter revocation process against PAR.

This came after PAR informed NAR that it would not withdraw or end the MLS Choice membership program.

Through the MLS Choice membership option, real estate licensees are able to become members of PAR and access the local MLS without becoming members of the **Arizona Association of Realtors** or NAR.

Through MLS Choice, brokers who are PAR members are able to "offer their agents the opportunity to access both the MLS and legal forms, along with several existing benefits, outside of the traditional three-tier membership system," according to PAR's website.

Last week NAR sent a cease-and-desist letter to PAR asking it to end the program. At the time, NAR told HousingWire that its actions were necessary to "support and defend the Realtor trademark."

In response to a question about its decision to begin the revocation process, a NAR spokesperson wrote in an email that per their charters, state and local associations are prohibited from adopting any practice inconsistent with NAR's bylaws and Constitution.

## Featured Events



Hosted By **Demo Day**
**February Virtual Demo Day**



Hosted By **HousingWire**
**Housing Economic Summit**

"Phoenix Realtors is violating NAR's bylaws and Constitution by offering a non-Realtor membership option. Without action, we put the benefits NAR members rely on—such as market research, business resources, a unified advocacy platform, and a single Code of Ethics—and the organization itself at risk," the spokesperson wrote. "NAR has begun the process—as outlined in our bylaws—to revoke Phoenix Realtors' charter. As a next step, Phoenix Realtors will have an opportunity to meet and discuss with a panel of NAR's Executive Committee. Should the local association continue to violate NAR policy, a hearing before a larger panel of our Executive Committee will be scheduled."

In an emailed statement, PAR CEO and President Andrea Aker called NAR's decision "a disservice to the industry."

"We've been transparent from the beginning that the MLS Choice subscription is a scaled-down option of non-membership for real estate professionals to consider. It allows them to ask the question, 'What level of programs and services do I actually need to be successful?' And anyone serving real estate professionals should stand in support of that: creating the ideal environment for success," Aker wrote. "A 'one-size-fits-all' approach does nothing to spur this industry forward, something



Hosted By **HousingWire**
**The Gathering 2025**

## Featured White Papers

Personal Insurance Marketplace Outlook 2025: Strategies for value creation

Published by HUB International

Elevating mortgage servicing through strategic outsourcing: A path to efficiency and growth

Published by AIS

How investing in a variety of servicing technologies streamlines operational efficiencies

Published by ServiceLink

## Featured Sponsored Video

that desperately needs to happen."

Aker said PAR is committed to Realtors and evolving alongside the changing industry, but she does not feel that NAR shares the same conviction.

"NAR has clearly committed to hampering innovation," she wrote.

"We are prepared to continue defending the necessity of subscription options like MLS Choice, and we stand behind all of the professionals we serve," Aker added.



Long Island to Leadership: Jackie Studdert's Vision for the Future of Mortgages

More:

Arizona

National Association of Realtors

Phoenix

## Most Popula



Appeals of

## Latest Articl



Has spring

# EXHIBIT 5

**The New York Times**

https://www.nytimes.com/2023/12/27/realestate/national-association-realtors-real-estate.html

# Powerful Realtors Group Loses Its Grip on the Industry

The National Association of Realtors is facing antitrust lawsuits and sexual harassment allegations, and real estate agents are now looking for alternatives.



**By Debra Kamin**

Debra Kamin spent much of 2023 covering the challenges currently facing N.A.R., and in November traveled to its annual convention in Anaheim, Calif.

Published Dec. 27, 2023   Updated Jan. 19, 2024

The staff members of the National Association of Realtors, the largest professional organization in the United States, were in a panic. Two days before the group's national convention, they had set up 400 exhibition booths and were expecting nearly 12,000 people to arrive for three days of speakers, training sessions and networking.

But now they were scrambling to find extra security and private bodyguards for members of their team because the former president, who had resigned under the weight of sexual harassment allegations, wrote an open letter that they interpreted as a plan to crash the convention.

The theme of the yearly gathering for 2023 was "Own the Moment."



Attendees pose for a group selfie at the inaugural gala of NAR NXT, the annual convention for the National Association of Realtors, in November.   National Association of Realtors

That day in November, it was obvious to the staff that N.A.R. — an organization that for more than a century has stood as a monolith of influence within the real estate industry — was losing its grip. This year delivered a one-two punch of dual scandals, and many within the organization admit N.A.R. is now in real danger of going under. Several high-profile real estate agents are talking about starting their own groups.

In addition to sexual harassment allegations, N.A.R. is taking on legal challenges to its policy that requires a listing agent to pay a fee to a buyers' agent in a home sale transaction — a fee that is nearly always passed on to the home seller. Just weeks before the convention, a federal jury agreed with a trio of Missouri home sellers that N.A.R. had operated a price-fixing conspiracy around agent commissions, and ordered damages of at least $1.8 billion.

Additional lawsuits, more than can be counted on both hands, are piling up. The specter of bankruptcy looms large. The Department of Justice is continuing an investigation into the group for antitrust violations, and some of the nation's largest brokerages, including Re/Max and Coldwell Banker, have said they will no longer require their agents to carry N.A.R. membership. Redfin will require agents in certain markets to cease paying dues.

"This is an extinction-level event," said Jason Haber, a real estate agent with Compass who has been one of the most outspoken critics of N.A.R. since the harassment allegations broke. "You cannot dispassionately look at the facts and say that everything is OK."



Kenny Parcell resigned from his role as president of N.A.R. in August 2023, two days after The New York Times exposed widespread allegations of sexual harassment against him.
National Association of Realtors



Following a bombshell lawsuit against N.A.R. and mounting allegations of sexual harassment at the organization, the chief executive, Bob Goldberg, announced he was taking early retirement from his role.  National Association of Realtors

Three top executives left this year, starting with Kenny Parcell, the president, who stepped down in August two days after a New York Times investigation revealed multiple allegations of sexual harassment and payments to women who reported

misconduct. Two weeks before the convention, Bob Goldberg, the organization's longtime chief executive, opted to retire more than a year early. Donna Gland, who had served as head of human resources for nearly four decades and was facing widespread calls for her removal, announced she was retiring one week later.

Mr. Goldberg still made an appearance at the convention. Nykia Wright, the 44-year-old newspaper executive who has been tapped as interim chief executive, attended the conference's inaugural gala and flew out after less than 24 hours.

Mr. Parcell sent an open letter to several high-ranking N.A.R. members, saying the sexual harassment allegations against him were "false and defamatory." He signed off his note, which he saved as a file titled "nar nxt pdf," with, "I hope to see so many of you in the future." The N.A.R. staff believed the note meant he planned to attend.



Tracy Kasper was president-elect of N.A.R. when Mr. Parcell resigned, and stepped into the role early. She has said the organization will recover from its current challenges, but industry analysts aren't so sure.  National Association of Realtors

Tracy Kasper, N.A.R.'s new president, sent her former ally a stony warning. N.A.R., she said, was aware of "immediate and serious concerns" about his "possible presence at N.A.R. events." Effective immediately, the note read, he was banned from all gatherings, and from making contact with staff members.

As Realtors streamed into the convention center on the first day, few noticed the extra security guards who had been hired.



Crowds at the Anaheim Convention Center for N.A.R.'s annual conference may not have noticed the extra security that was hired in case their disgraced former president chose to show up.  National Association of Realtors

Mr. Parcell did not attend.

In an email sent via his attorney, Mr. Parcell told the Times that he had sent the note to clear his name. "I have never sexually harassed anyone," he wrote.

"At no place in the letter did I say or imply that I was attending the NAR NXT convention," he wrote. "It is ridiculous and disingenuous to infer or conclude anything by the electronic PDF file name as opposed to the actual title of the letter and its contents."

N.A.R.'s new leaders spent the conference trying to assure members that the group would overcome its recent troubles.

"This is far from over," said Ms. Kasper from the stage at NAR NXT, just before she asked for a "very warm, Realtor welcome" for the event's keynote speaker, the actress Mindy Kaling.



The actress Mindy Kaling, left, was the keynote speaker at N.A.R.'s annual convention in November. She was interviewed by Jennifer Wauhob, right, N.A.R.'s former vice president of association affairs.  National Association of Realtors

The crowd, relieved by the vibe shift, whooped.

## N.A.R. vs. Everybody

N.A.R.'s power has been in its governance of the industry. With more than $1 billion in assets, the group controls access to the private databases used to list homes, called Multiple Listing Services, most of which are restricted to N.A.R. members only.

The group, based in Chicago, even owns the name so many people use to refer to real estate agents: "Realtor" is restricted to dues-paying members. N.A.R. also wields its influence in politics, operating the top political action committee in the country, raising more than $80 million for both Democratic and Republican candidates in the 2022 election cycle alone.

The Justice Department sued N.A.R. over its M.L.S. policies in 2008. They reached a 10-year settlement, and when it expired, the D.O.J. began issuing statements of interest — legal briefs that point out how the cases will affect the public — in multiple pending antitrust lawsuits, including the Missouri case and a separate class-action suit in Chicago over inflated fees.

Despite its mounting legal headaches, N.A.R. is not backing down. The organization has taken the U.S. government to court, suing the D.O.J. in 2021 to stop them from investigating their policies. After an initial victory in D.C. District Court, the D.O.J. appealed the ruling earlier this year.

"The D.O.J. is in this for the long haul," said Randy Airst, the chief executive of Exceedant, the real estate data analysis firm.

At the heart of the justice department's investigation is the question over whether N.A.R. can keep M.L.S. access behind a velvet rope.

Getting permission to use the M.L.S. is part of the draw to the organization for 1.6 million members. N.A.R. also has a commission policy that can be lucrative, depending on the market.

Under a N.A.R. rule, a home seller is required to pay commissions to the agent representing the buyer. Home sellers have long claimed that the rule forced them to pay excessive fees to the agents, but in the case of Missouri, a group finally sued.

The home sellers said the brokerages collaborated with N.A.R. to enforce what is called the "cooperative compensation rule." The trial lasted 11 days; the jury deliberated for less than three hours.

Under the verdict, sellers would no longer be required to pay buyers' agents, and agents would be free to set their own commission rates. For example, a home seller with a $1 million home can now pay as much as $60,000 in agent commissions — $30,000 to their agent and $30,000 to the buyers' agent.

"The basic fabric of the U.S. real estate market is being disrupted," said Thomas Ma, who co-founded Real Messenger, a messaging app for real estate agents.

N.A.R. was sued alongside a handful of brokerages, and the verdict allows the court to issue treble damages that could swell to more than $5 billion, far more than N.A.R. has in its coffers.

N.A.R. has said it will appeal.

The same day the home sellers in Missouri won their case, their lead attorney, Michael Ketchmark, had filed yet another case. This one has potentially catastrophic implications for the Realtor organization.

The new suit, which is being called Gibson after the name of its lead plaintiff, also makes an accusation of conspiracy over inflated real estate commissions. It names a number of major brokerages as defendants alongside N.A.R. — this time they include eXp World Holdings, Compass and Redfin.

This new case represents home sellers in every state. When the suit was filed, the requested damages were enough to make industry insiders' jaws drop: Mr. Ketchmark and his team are seeking $200 billion this time around, with the knowledge that the judge could again choose to treble that number up to $600 billion.

"I've always referred to it as Whack-a-mole," Mr. Ketchmark said of taking on N.A.R.'s influence. "Our goal is to unplug the Whack-a-mole machine and topple them completely."

Industry analysts say they do not see N.A.R. surviving.

"This is done," said Mr. Airst. To come back from the verdict with its finances intact, he said, "There are so many gantlets that N.A.R. would have to run through, and win every time."

The first gantlet, Mr. Airst said, is coming up with billions of dollars for appeals.

"The money is not there," he said.

## Alternatives

Should N.A.R. implode, some industry leaders say they are ready to fill the vacuum.

Mr. Haber, the Compass agent, said he has been seeking out funding for a new trade organization, with aspirations to establish it by the middle of 2024 if N.A.R. doesn't recover.



Real estate mogul and reality TV star Mauricio Umansky is among the big-name
brokers currently holding talks about a potential alternative to N.A.R.  Ariana Drehsler for
The New York Times

Real estate mogul and reality TV star Mauricio Umansky, who is currently suing
N.A.R. after they tried to shut down his private home listings site, also said he is
laying the groundwork to start an alternative association.

"They're making decisions to protect themselves and the multiple listings
services," Mr. Umansky said of N.A.R. "They worry more about that than
protecting the realtors."

Mr. Umansky and Mr. Haber both said they have spoken to each other and are
open to joining forces.

Robin Philips, a Realtor in Dodge, Neb., has been a member of N.A.R. for 22 years. She said she was stunned that N.A.R. had not launched a stronger defense in court and is worried about losing income if the rules for commissions are changed.

"I feel like we were really let down in these lawsuits. We pay a lot of money to be defended and I don't believe we were," she said.

Women, though not always in high positions in the organization, make up about 66 percent of N.A.R.'s membership, and there is a fear that they will leave and take their dues with them.

Following the convention, N.A.R.'s 69-person executive committee approved a new policy: a lifetime ban from all N.A.R. events for any elected officer who resigns or is removed from office.

The changes might not be enough. The sexual harassment allegations have already inflamed frustrations, said Dustin Brohm, a Realtor in Salt Lake City who hosts a popular real estate podcast, Massive Agent.

"Most agents I talk to say if they had the choice to not be a member, they would choose not to," Mr. Brohm said. "The sexual harassment allegations feel like the straw that broke the camel's back, and a lot of people are now saying, 'This is just insane.'"

Even agents who describe themselves as longtime loyalists said they are growing more disenchanted.

"N.A.R. has done a horrible job of telling us what they do for us," Mr. Brohm said.

On his Instagram page, he recently asked his more than 20,000 followers if they think their N.A.R. membership offers them value for money.

About 97 percent of respondents said no.

**Debra Kamin** reports on real estate, covering what it means to buy, sell and own a home in America today. More about Debra Kamin

# EXHIBIT 6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DOUGLAS H. HARDY, M.D., GLENN CHAMPION, ESQ. | CASE NO.24-cv-12102 |
| DYLAN TENT, ET AL, As Representatives of a | HON. Jonathan J.C. Grey |
| Class of Real Estate Brokers and Agents, | Mag. Judge David D. Grand |

PLAINTIFFS,

CLASS ACTION

V.

NATIONAL ASSOCIATION OF REALTORS,

MICHIGAN ASSOCIATION OF REALTORS,

THE GROSSE POINTE BOARD OF REALTORS,

GREATER METROPOLITAN ASSOCIATION OF

REALTORS, NORTH OAKLAND COUNTY BOARD

OF REALTORS AND REALCOMP II,

DEFENDANTS.

---

MICHAEL S. CLAWSON PLLC
Michael S. Clawson P35728
Attorney for Plaintiffs
41000 Woodward Ave., Suite 395 East
Bloomfield Hills, Michigan 48304
(248) 433-4366
msc@mikeclawsonlaw.com

---

**FIRST AMENDED COMPLAINT**

---

PLAINTIFFS, Douglas H, Hardy, M.D., Glenn Champion, Esq., Dylan Tent, et al., pursuant to FRCP 15(a)(1) file their amended complaint, stating as follows:

## PRELIMINARY STATEMENT

This class action complaint challenges the requirement that all Realtors, Brokers and Agents in the State of Michigan and nationally be members of the National Association of Realtors, their state board of realtors such as the Michigan Association of Realtors, and a local Board of Realtors such as The Grosse Pointe Board of Realtors, The Greater Metropolitan Association of Realtors and/or The North Oakland County Board of Realtors to access the Multiple Listing Service, known as the "MLS". REALCOMP II is a software company that manages the MLS and regulates its use by brokers and agents. The Plaintiffs challenge the compulsory membership in these associations to gain access to the MLS and the information it provides and allege that this pattern and practice of the Defendants constitutes a violation of the Anti-Trust laws, Unfair Restraint on Trade, a Monopoly and Conspiracy. While these alleged patterns and practices by Defendants have existed for years, the recent settlement by the NAR of a national class action lawsuit out of Missouri eliminated the requirement of a broker's compensation to be reflected on the MLS, essentially inviting brokers and agents to participate in deceptive compensation practices, and greatly diminished any value these organizations had to individuals such as the Plaintiffs. Thus, this compulsory membership and the changes implemented and required by NAR as a result of the settlement, have rendered membership in these organizations of no benefit. Yet to successfully practice the sale of residential real estate and access the information compiled by the MLS, nationally and in the State of Michigan, membership in these organizations is mandatory. This required membership creates a restraint of

trade to real estate brokers and agents who do not wish to belong to these organizations as brokers and agents consider the use of the MLS to be a necessity.  Plaintiffs have standing to bring these claims as they have suffered an anti-trust injury, and they are an efficient enforcer of the anti-trust laws.  The real estate market is the relevant market and access to the MLS is a product which Plaintiffs seek to access. Defendants have tremendous market power as they tie membership in their organizations to accessing the information available on the MLS. This pattern and practice also constitutes a monopoly in that brokers and agents would be unable to fairly compete with other realtors who are members of these organizations as these organizations prohibit access to the information contained in the MLS without membership. Moreover, this information is not available from any other source. Defendants also require members such as Plaintiffs to pay yearly membership fees to at least three organizations for each broker and agent. This practice is not limited to Michigan and in fact is present in most states where these requirements are similarly dictated by the NAR and the state and local boards.  Defendants coerce Plaintiffs to belong to their organizations by wielding their market power and thereby force brokers and agents into membership and paying their requisite fees. This tying of membership to the MLS has a substantial effect on Interstate commerce. In Southeastern Michigan alone, there are over 16,000 members in Defendant organizations paying tens of millions of dollars to Defendants in order to access the MLS.   Plaintiffs seek to challenge this compulsory membership and Defendants' policies as unlawful.

## NATURE OF THE CASE

1.   The Individual Plaintiffs (hereinafter referred to as "Plaintiffs") bring this action on behalf of themselves and a class of similarly situated Real Estate Brokers and Agents seeking to redress the wrongful acts of the Defendants which have resulted in a loss of all Plaintiffs'

earning potential as a collective group, a detriment to their businesses as a whole, and a mandatory requirement that they belong to these associations which no longer results in a benefit to them.

2.      The information contained on the MLS and which is entirely controlled by the Defendants is not available from any other source.

3.      The compulsory nature of membership in Defendants' organizations in order to access the MLS is a restraint on their ability to conduct business in a fair and unencumbered manner which has resulted and will continue to result in them incurring damages.

4.      The compulsory nature of these memberships creates a monopoly among Brokers and agents who are members of these groups and preclude those who are not from accessing the information available through the MLS.

5.      The Defendants are monopolists as they, through their mandatory membership requirements, control the real estate market by denying those who are not members from accessing information which is vital to them doing business.

6.      In order to access the information maintained on the MLS, which includes the property's history, tax information, past sales information, assessments, valuation, size, acreage, sales data and several other important statistics, Defendants require membership in the national, state and local organizations.

7.      The Defendant organizations control access to the information contained on the MLS and therefore control the marketing and sale of residential real estate which  constitutes the market.

8.      The information contained on the MLS is unique, and there is no other alternative available to Plaintiffs which contains the same or substantially similar information.

9.    Each of these organizations charges brokers and agents a separate yearly membership fee in order to belong to these boards and access the information contained on the MLS. Therefore, each broker and agent is charged 3 fees; one each for the national, state and local boards.

10.   Historically, while membership in these organizations was tolerated by the Plaintiffs and other similarly situated brokers and agents, recent changes and requirements implemented by the National Association of Realtors, the Michigan Board of Realtors and the local boards of realtors have made these memberships of no value other than to access the MLS.

11.   Prior to initiating this action, Plaintiffs reached out to the National Association of Realtors, the Michigan Board of Realtors and the other named Defendants specifically asking that they be exempt from membership.

12.   In response to each inquiry, Plaintiffs were informed that membership was a mandatory requirement, and they would not be allowed to access the MLS if they were not members and did not pay the full membership fees.

13.   Plaintiffs do not seek to be allowed access to the MLS information *gratis*, rather, they seek to be able to access the information without the necessity of belonging to at least three organizations; the NAR, the Michigan Association of Realtors and a local board of realtors and paying three sets of fees for each broker and agent.

14.   Access to the MLS through mandatory membership in these organizations creates a market wide injury and essentially eliminates competition from those brokers and agents who are not members.

15.   Defendants' mandatory membership requirements create a tying arrangement between membership and access to the MLS which is unreasonable because membership in these

organizations is not voluntary but compulsory.

16. Further, the assessment of fees by at least three different organizations, the NAR, the State Board and the local Board, is unreasonable and excessive, especially for those brokers and agents who practice in smaller firms or individually.

17. Defendants' required membership in their organizations, the fees which are assessed by them and the restriction of access to information on the MLS, which is essential to a Broker or agent transacting business, constitutes a restraint of trade.

18. Defendants' practice of requiring mandatory membership in their organizations creates a monopoly over the real estate market as they have complete control over the information on the MLS which brokers and agents consider a necessity in order to do business.

19. Although licensed in the State of Michigan, real estate brokers and agents are precluded from accessing the MLS without these compulsory memberships and paying the fees associated with them.

20. Brokers and agents have no alternate source to the information contained on the MLS.

21. Plaintiffs have standing to challenge this practice as they have suffered an anti-trust injury and are appropriate parties to enforce the antitrust laws as they are brokers and agents who conduct business in the real estate market.

22. Plaintiffs' claims qualify as anti-trust violations as they focus on the tying of two (2) separate products and services: membership in the Defendants' organizations and access to the MLS in a relevant market, the residential real estate market.

23. Defendants' exclusive control over the MLS equates to tremendous market power which they exercise over Plaintiffs and other similar parties.

24. This power and the tying of membership to the use of the MLS is unreasonable and has a

substantial effect on interstate commerce as it creates millions of dollars in fees for the Defendants each year.

25. Defendants have a tremendous economic interest in promoting its practices as these practices directly generate the fees they receive.

26. Defendants' uniform policies and procedures which require mandatory membership in their organizations, and their exclusive control over the MLS, is knowing, intentional and overt and constitutes a concerted action to monopolize.

27. Defendants' practices and actions render them monopolists as they hold significant market power in the real estate arena, specifically Michigan and southeast Michigan, which allows them to control the market and diminish or eliminate competition.

## JURISDICITON AND VENUE

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

29. Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. 1391 (a) and (b).

## PARTIES

## THE PLAINTIFFS

30. Douglas Hardy, MD is the owner of Snyder Kinney Bennett and Keating LLC which is a Michigan Limited Liability Company, and which does business in Southeastern Michigan as Signature Sotheby's International Realty. Signature Sotheby's International Realty of Novi and Signature Sotheby's International Realty of Grosse Pointe are also subsidiaries

of Signature Sotheby's and also operate in the real estate business (the Sotheby entities).

These entities consist of approximately 100 brokers and agents. All of these entities,

specifically their brokers and agents, engage in the listing and sale of real property,

primarily residential, and all are members of the National Association of Realtors (NAR),

the Michigan Association of Realtors (MAR) and local organizations such as the Grosse

Pointe Board of Realtors (GPBOR), the Greater Metropolitan Association of Realtors

(GMAR) and the North Oakland County Board of Realtors (NOCBOR).

31.     Douglas Hardy and Glenn Champion are the primary brokers for the Sotheby entities and

operate their business in Southeastern Michigan. Dylan Tent is a representative of all

agents and /or associate brokers for the Sotheby entities and also conducts business in

Southeastern Michigan.

32.     All of the Plaintiffs are real estate professionals who hold valid Real Estate Licenses in

the State of Michigan and who, in order to use the MLS, must be members of NAR,

MAR and at least one (1) local organization such as GPBOR, GMAR and NOCBOR.

33.     All of the Plaintiffs earn their living based upon the marketing and sale of real property and

the commissions derived therefrom. All Plaintiffs are required to pay dues to the

Defendants, and all Plaintiffs are required to be members of the aforementioned in order to

access the information on the MLS.

## THE DEFENDANTS

34.     Defendant NAR is a national organization with its headquarters located at 430 N.

Michigan Avenue, Chicago, Illinois. Defendant MAR is a statewide organization located

at 720 N. Washington Ave., Lansing, Michigan. GPBOR is a local organization located at

710 Notre Dame Street, Suite 2, Grosse Pointe, Michigan. GMAR is a local organization

located at 24725 West 12 Mile Road, Suite 100, Southfield, Michigan 48034. NOCBOR

is a local organization located at 4400 West Walton Boulevard, Waterford, Michigan

48329. REALCOMP II is a software company located at 27555 Farmington Road, Suite

325, Farmington Hills, Michigan 48334.

35.    All Defendants solicit real estate broker and agent professionals throughout the State of

Michigan.

36.    The Defendants own operate and maintain the MLS which is an electronic listing service

which publishes all of the real estate listings, the specific characteristics of each property,

the commission agreement, property taxes and all other pertinent information regarding

the property. Up until recently, the MLS contained clear and unambiguous information

regarding a broker's commission.

37.    While the NAR up until recently predicated access to the MLS upon being a member of

its organization, it changed this policy after a series of cases in Florida, Georgia and

Alabama, and California found the compulsory membership to be an unfair restraint of

trade. Despite this,  NAR has transferred this mandatory membership requirement to the

state and local boards, which essentially perpetuates their same compulsory membership

practices which have been found to be illegal. In fact, NAR charters each of the local

boards of Realtors and sets the rules and guidelines for how each shall operate.

Specifically, Plaintiffs are required to be members of all three entities, NAR, MAR and a

local board, in order to utilize the MLS service.

38.    NAR, through MAR and local boards such as the GPBOR, GMAR and NOCBOR

continue to require membership in their organizations to utilize the MLS without

exception. The local boards, such as GBOR, GMAR and NOCBOR, et al are the sole

owners of REALCOMP II and control the membership and use of the MLS.

## FACTUAL ALLEGATIONS COMMON TO ALL OR MULTIPLE COUNTS AGAINST ALL DEFENDANTS

39. The Plaintiffs are Real Estate Brokers and Agents licensed as realtors in the State of Michigan and are all engaged in the marketing and sale of primarily residential real property.

40. The Plaintiffs are all compulsory members of the Defendant organizations.

41. In early 2024, Plaintiffs initially contacted Defendants and requested that they be allowed to use the MLS system without being members. Alternatively, Plaintiffs requested that they be allowed to drop their membership in these organizations altogether. These requests were echoed and repeated in June and July 2024.

42. REALCOMP II, MAR and the local boards all responded to the Plaintiffs' inquiry uniformly denying this request and reiterating that membership in all three of these entities was mandatory without exception.

43. This membership requirement is mandatory for Plaintiffs to access the MLS even though NAR allows access to non-Realtors.

44. Defendants mandate membership in their organizations which is analogous to mandating membership in a union or other trade organization depriving the members of free choice.

45. Additionally, the Defendants charge significant membership fees which Plaintiffs have paid in the past and continue to pay today.

46. Up until recently, as a part of being a member in the Defendant organizations, Plaintiffs were provided with a guarantee of commission pursuant to the Broker Fee component of the MLS.

47.   In November 2023, Defendant NAR agreed to settle a class action lawsuit which had, as a part of the settlement, an agreement to remove the guaranteed broker commission from the MLS.  Pursuant to the settlement, NAR propagated a new MLS rule which prohibited offers of compensation being listed on the MLS.  Each of the Defendants adopted this rule and implemented it.

48.   This change had the effect of diminishing transparency regarding broker and agent commissions as they were no longer part of the MLS and were not published.

49.   This decision greatly diminished any value created by the compulsory membership requirement in their organizations as there is now no guarantee of broker commission associated with using the MLS.

50.   This truly eliminated the sole purpose of the NAR and MAR sponsored MLS systems by eliminating the guarantee of compensation between brokers.

51.   Further, while NAR and MLS have argued that the removal of this information is for the benefit of the consumer, Plaintiffs believe it is contrary thereto and invites side negotiations, disharmony among agents and brokers and confusion for the consuming public and even allows for individual and potentially discriminatory pricing per buyer which is a fair housing violation, none of which is a benefit to the consumer.

52.   Despite this lack of benefit, Plaintiffs are required to belong to Defendants' organizations in order to do business as they alone control access to the MLS.

53.   The requirement of membership in the Defendant organizations constitutes a conspiracy to monopolize the use of the MLS and creates barriers to the market for all realtors, agents and brokers who seek to enter the market but who do not wish to belong to one of the Defendant organizations.

54.     The compulsory nature of Plaintiffs' membership in the Defendants' organizations in order to access the MLS is a restraint on their ability to conduct business in a fair and unencumbered manner which has resulted in and will continue to result in them incurring damages.

55.     The compulsory nature of these memberships creates a monopoly among brokers and agents who are members of these groups and preclude those who are not from accessing the information available through the MLS.

56.     The Defendants are monopolists as they, through their mandatory membership requirements, control the real estate market by precluding those who are not members from accessing information which is vital to brokers and agents doing business.

57.     In order to access the information maintained on the MLS, which includes the property's history, tax information, past sales information, assessments, valuation, size, acreage and several other important statistics, Defendants require membership in the national, state and local organizations.

58.     The Defendant organizations have exclusive control over the information contained on the MLS and access to it.

59.     The information contained on the MLS is unique and there is no other alternative available to Plaintiffs which contains the same or substantially similar information. Although licensed in the State of Michigan to sell real estate, brokers and agents are precluded from accessing the MLS unless they are members of these organizations. Brokers and agents consider access to this information a necessity in order to do business.

60.     Each of these organizations charges brokers and agents separate membership fees in order to belong to these boards and access the information contained on the MLS.

61.    Historically, while membership in these organizations was tolerated by the Plaintiffs and other similarly situated Brokers and agents, recent changes and requirements implemented by the National Association of Realtors, the Michigan Board of Realtors and the local boards of realtors has made these memberships of no value other than access to the MLS.

62.    Plaintiffs do not seek to be allowed access to the MLS information *gratis*, rather, they seek to be able to access the information without the necessity of belonging to at least three organizations; the NAR, the Michigan Association of Realtors and a local board of realtors.

63.    The sale of residential real estate is largely governed by Defendants. In fact, according to REALCOMP II's own website, it has a membership in southeast Michigan alone of 16,000 brokers and agents, roughly half of all licensed brokers and agents in the State of Michigan. These numbers illustrate the hold Defendants have on the market.

        Defendants control the real estate market as they have complete control and access to information which is vital to a broker or agent's practice in the field of residential real estate sales, information which is not available from any other source.

65.    Defendants' control over the real estate market constitutes monopoly control over the market and is unreasonable.

66.    Defendants' control over this market negatively affects competition, causes market-wide injury and limits consumer choice in that in order to do business in the real estate market, one must be a member of the Defendant organizations.

67.    Access to the MLS through mandatory membership in these organizations creates this injury and limits or eliminates competition from those brokers and agents who are not

members.

68.   Defendants participate in a single plan whereby they have conspired to require mandatory membership in each of their organizations in order to practice in the residential real estate arena.

69.   Defendants coordinate membership policies and fee structures which benefit each of them financially.

70.   This uniform and consistent enforcement of policies and procedures which mandates membership in order to access the MLS is knowing, intentional and overt and constitutes a concerted action on the part of Defendants.

71.   The effect of the conspiracy is to create this three-tiered mandatory membership requirement which generates substantial fees to each of the Defendants and forecloses brokers and agents from practicing in the real estate arena without membership.

72.   There are over 34,000 licensed realtors in the State of Michigan generating over 20 Million Dollars in fees annually thereby illustrating the enormous financial benefit being realized by Defendants.

73.   The mandatory nature of these memberships, the tying of membership to the MLS and the fees assessed create economic harm, particularly for smaller brokers and agencies with less capital, making it harder for them to compete.

74.   Simply put, Plaintiffs wish to be able to practice as agents and brokers in the real estate market without the mandatory requirement of belonging to at least three different boards and paying three different fees for each broker or agent that is a member. Further, they wish to be able to access the MLS without the same mandatory requirements as dictated by the Defendants.

75.     Plaintiffs requested permission to opt out of this required membership and were denied.

76.     This denial and the resulting mandatory membership requirement to access the MLS is

         wrongful and has and will continue to cause Plaintiffs to be damaged.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this action individually and on behalf of a class of similarly situated

         Individuals defined as all real estate agents and brokers in the State of Michigan who are

         required to be a member of the Defendants in order to use the MLS even though each holds

         a valid real estate license to practice in the State of Michigan. Specifically, the Class of

         Plaintiffs consists of the following:

         a.   All real-estate agents and brokers who are required to be members of the NAR;

         b.   All real-estate agents and brokers who are required to be members of the MAR;

         c.   All real-estate agents and brokers who are required to be members of a local board

              such as the GPBOR, GMAR and NOCBOR;

         d.   All real estate agents and brokers who must use REALCOMP II in order to access

              the MLS.

78.     There are well defined common questions of fact and law which exist as to all members of

         the Class and that predominate over any questions affecting only individual members of

         the Class and which may be determined without the reference to the individual

circumstances of any Class member and include, but are not limited to, whether the compulsory nature of membership in the Defendant organizations constitutes an unfair restraint on trade and economic coercion, violates the Anti-Trust laws, and is a result of a conspiracy among the Defendants.

79.     In addition, there is a common question among all Class members whether these actions have and will continue to have an adverse economic effect on the Class members.

80.     Also, as to real-estate professionals, who are members of the Class, now that the NAR has unilaterally agreed to change the tenants of the MLS, there is no benefit derived from being a member as to commission guarantees. This affects both agents and brokers.

81.     Neither Plaintiffs nor their counsel have any adverse interest to or in conflict with the interests of the absent members of the Class. Plaintiffs are able to fairly and adequately represent and protect the interests of the Class.  Plaintiffs will vigorously pursue these claims.  If necessary, Plaintiffs may seek leave from this Court to amend the class action and to include additional class representatives or additional claims as may be appropriate. A class action is superior to other available methods of a fair and efficient adjudication of this controversy because individual litigation of these claims for all Class members would be impracticable. Further individual litigation would be burdensome to the courts, and could result in varying, inconsistent and contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system from multiple trials of

the same factual issues.

## COUNT ONE

## RESTRAINT OF TRADE AND ANTI-TRUST VIOLATIONS

## VIOLATION OF THE MICHIGAN ANTI-TRUST REFORM ACT

82.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

83.     The Michigan Anti-Trust Reform Act, MCL Section 445.771 prohibits any legal entity from using a contract, combination of entities or a conspiracy between 2 or more persons in the restraint of or to monopolize trade or commerce in a relevant market.

84.     Here, Plaintiffs all conduct business in the real estate market in the State of Michigan, and all are required by Defendants to be members of their organizations in order to access the MLS.

85.     Defendants' mandatory membership requirements in their organizations constitute a combination of entities which seek to restrain the Plaintiffs from doing business in the State of Michigan. Specifically, these organizations, as a group, require that all Plaintiffs be members in order to practice as brokers and agents and to access the information contained on the MLS.

86.     Such a requirement and the act of tying membership in their organizations to accessing the MLS is a restraint of trade as it deprives Plaintiffs of free choice as to whether to be a member and seeks to monopolize the information contained on and access to the MLS.

87.     Defendants control the information on the MLS which is unique, and which is not available from any other source.

88.     Each Defendant ties access to this information to membership in their organizations and

charges substantial fees to each broker and agent.

89.    This practice impedes competition and causes a market wide impediment to those brokers and agents who are not members and those who do not wish to be members.

90.    This practice negatively affects consumer choice and market competition as there are no alternatives to the MLS.

91.    This practice of compulsory membership generates millions of dollars for the Defendants annually.

92.    Plaintiffs have requested that they be allowed to opt out of membership and have been routinely informed that they cannot do so.

93.    Defendants' actions in this regard constitute a violation of the Michigan Anti-Trust Reform Act and have and will continue to cause Plaintiffs to incur damages.

## COUNT II

## RESTRAINT OF TRADE AND ANTI-TRUST VIOLATIONS

## 15 USC SECTION 1

94.    Plaintiffs re-allege and incorporate all of the allegations contained above.

95.    The Sherman Anti-Trust Act, codified at 15 USC Sections 1, protects trade and commerce against unlawful restraints and monopolies.

96.    A restraint on trade is determined by the rule of reason and is unlawful if it is unreasonable based upon the relevant circumstances.

97.    Defendants' requirement that Plaintiffs be members of their organizations to access the information contained on the MLS constitutes an unfair restraint on trade which is in violation of the Anti-Trust Act.

98.     Such a requirement and the practice of tying membership to accessing the MLS is a restraint of trade as it deprives the Plaintiffs of free choice as to whether to be a member and forces Plaintiffs to be members of their organizations to gain access to information only available on the MLS.

99.     Further, Defendants require, as a part of this mandatory membership, the payment of fees by each broker and agent to each of the Defendants to gain access to the information on the MLS.

100.    Defendants' mandatory membership requirement in their organizations constitutes a combination of entities which restrain the free conduct of business.

101.    The act of tying membership to MLS access is unreasonable and impedes Plaintiffs from doing business in the State of Michigan as they have no choice in practicing in the real estate arena but to maintain membership in these organizations against their will.

102.    This practice of compulsory membership generates millions of dollars for Defendants annually.

103.    Plaintiffs have repeatedly requested that they be allowed to opt out of membership and have been routinely informed that they cannot do so.

104.    Plaintiffs have also repeatedly asked to opt out of membership and be allowed to access the MLS under different circumstances and have been denied.

105.    The actions of Defendants have caused a market wide injury as it affects all brokers and agents who wish to practice in the residential real estate arena and limits competition to only those brokers and agents who conform to Defendants' mandatory requirements.

106.    Defendants' refusal to allow Plaintiffs access to the MLS under any other circumstances other than agreeing to full membership in each of their mandatory organizations is a

restraint on trade as defined by 15 USC, Section 1.

107.   Defendants' actions in this regard constitute a violation of the Federal Anti-Trust Act and have and will continue to cause Plaintiffs to incur damages.

## COUNT III

## ANTI-TRUST VIOLATIONS

### 15 USC SECTION 2

108.   Plaintiffs re-allege and incorporate all of the allegations contained above.

109.   Section 2 of The Sherman Act protects against monopolies in a relevant market.

110.   To prevail under Section 2, a party must plausibly allege that the Defendants possess a monopoly power over the market in which they are engaged.

111.   Defendants possess absolute market power as they control, through their membership requirements, access to information which is vital to practicing as a broker or agent in the residential real estate market and which is not available through any other source.

112.   Defendants locally and the NAR nationally control the sale of residential real estate. They, for example, set all of the rules and regulations governing the sale of residential real estate in Michigan and require membership in the local, state and national boards in order to access information on the MLS; information which is not available from any other source, and which is necessary for brokers and agents to do business.

113.   The Defendants control access to the MLS which is essentially the only source for real estate information in the industry.

114.   The control by Defendants of this information and their refusal to allow access to it without the compulsory joining of a local, state and national board essentially eliminates

any competition and leaves no remedy for Plaintiffs and those similarly situated but to join these organizations.

115. This control has a market-wide effect on competition, and Defendants' practices are anti-competitive and essentially create a monopoly which controls the MLS and its information.

116. Moreover, this practice of tying membership to access the MLS has a negative effect on consumer choice and market competition due to the lack of any alternative to the MLS.

117. This monopoly generates millions of dollars in fees annually for the Defendants and creates a substantial effect on Interstate Commerce.

118. Defendants have a substantial economic interest in keeping Plaintiffs and other similar parties in their organizations.

119. Defendants' actions in this regard constitute a violation of the Federal Anti-Trust Act and have and will continue to cause Plaintiffs to incur damages.

## COUNT IV

## CIVIL CONSPIRACY

120. Plaintiffs re-allege and incorporate all of the allegations contained above.

121. Defendants collectively control access to the MLS.

122. Defendants mandate membership in their organizations in order to hold hostage access to the MLS only allowing those entities and persons who pay membership fees the ability to access to same.

123. In order to perpetuate the above scheme and continue to mandate the class members to comply with their membership requirements, Defendants use their overwhelming economic power and market dominance to coerce Plaintiffs into belonging to these

organizations.

124.   Defendants further wield their economic power and market dominance in a coercive

manner by unilaterally refusing Plaintiffs from opting out of membership.

125.   Defendants' extortionate conduct is made more effective by, and enforced through, their

conspiracy.

126.   Defendants participate in a single plan whereby they have conspired to require

mandatory membership in each of their organizations in order to effectively practice in

the residential real estate arena.

127.   Each of the Defendants shares the same general conspiratorial objective which is to

mandate that real estate brokers and agents be members in each of their organizations.

128.   The Defendants collude to coordinate policies which require membership thus allowing

them to benefit financially.

129.   Further, this required membership and Defendants overt act of prohibiting Defendants

from canceling their membership is indicative of and furthers the objectives of this

conspiracy.

130.   Each of the Defendants, individually and jointly, participates and have participated in

this conduct for many years.

131.   Each local organization requires membership in the state and national organization so

essentially membership in all three is required in order to access the MLS and practice

in the residential real estate industry.

132.   The effect of the conspiracy is to create mandatory membership which generates

substantial fees totaling millions of dollars to each of the Defendants and forecloses

brokers and agents from practicing in the real estate arena without membership.

133.   The Defendants knowingly participate in this concerted conduct with an intent to monopolize the market and do so overtly.

134.   Defendants' actions in this regard creates a conspiracy which has and will continue to cause Plaintiffs to incur damages.

## RULE 23(a)

### Typicality

135.   The named Plaintiffs and the members of the Class and Subclasses each and all have tangible and legally protectable interests at stake in this action.

136.   The claims of the named class representatives and the absent Class and Subclass members have a common origin and share a common basis.  Their claims originate from the same illegal, extortionate, fraudulent and conspiratorial abetting practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the members of the Class and Subclasses.  As such, each named Plaintiff has been the victim of the illegal practices at the hands of the Defendants as set forth herein.

137.   The proposed Class and Subclass representatives state claims for which relief can be granted that are typical of the claims of absent Class and Subclass members.  If brought and prosecuted individually, the claims of each Class and Subclass member would necessarily require proof of the same material and substantive facts, rely upon same remedial theories, and seek the same relief.

138.   The claims and remedial theories pursued by the named Class representatives are sufficiently aligned with the interests of absent Class and subclass members to ensure that the universal claims of the class and subclasses will be prosecuted with diligence and care by the Plaintiffs as representatives of the class and subclasses.

## Numerosity

139.   The members of the Class and subclasses are so numerous and ascertainable as the names and addresses of all Class and Subclass members can be identified through Plaintiffs' business records.

## Commonality

140.   There are questions of law and fact common to the Class as set forth above including the mandatory membership requirements in Defendants organizations and whether that constitutes an unfair restrain on trade.

## RULE 23(a)(4)

141.   Plaintiffs' counsel will be able to adequately represent the members of the Class. He has practiced in the area of real estate litigation for over forty (40) years, has represented numerous agents and brokers during this time and is familiar with the claims being asserted in this action.

## RULE 23(b)(1)(A) AND (B)

142.   The prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

143.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the

Class which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the plaintiff Class.

## RULE 23(b)(3)(2)

144. The questions of law and fact common to members of the Class and Subclasses predominate over any questions affecting only individual members.

145. A Class Action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that it will allow for the fair, timely and economical determination of these issues in one forum and one action as opposed to multiple forums and multiple actions.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs, and members of the Class and Subclasses pray for the following relief:

A. A Judgment in favor of Plaintiffs and against Defendants on each of the Counts set forth herein.

B. An award of damages in such amount as will fairly compensate the Plaintiffs and members of the Class.

C. An award of costs and attorney fees incurred on behalf of the Plaintiffs; and

D. Award such other relief as this Honorable Court determines is just to compensate Plaintiffs and the members of the Class.

## JURY DEMAND

Plaintiffs request a trial by jury in this matter.


Dated: November 21, 2024.

Respectfully submitted,

*/s/ Michael S. Clawson*

Michael S. Clawson P35728

Attorney for Plaintiffs

41000 Woodward Ave., Suite 395 E

Bloomfield Hills, Michigan 48304

(248)433-4366

## **CERTIFICATE OF SERVICE**

I certify that on November 21, 2024, I electronically filed the foregoing First Amended Complaint using the electronic court filing system which will send notification of such filing to all counsel of record.

/s/ *Michael S. Clawson*
Attorney for Plaintiffs